No. 23-1361

IN THE

# United States Court of Appeals
## for the First Circuit

PUBLIC INTEREST LEGAL FOUNDATION, INC.

*Plaintiff-Appellee,*

v.

SHENNA BELLOWS, in her official
capacity as the Secretary of State for
the State of Maine,

*Defendant-Appellant.*

## BRIEF OF PLAINTIFF-APPELLEE
## PUBLIC INTEREST LEGAL FOUNDATION, INC.

Noel H. Johnson (Wis. Bar # 1068004)
Kaylan L. Phillips (In. Bar #30405-84)
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street, Suite 700
Alexandria, VA 22314
Phone: 703-745-5870
njohnson@PublicInterestLegal.org
kphillips@PublicInterestLegal.org

*Attorneys for Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The Public Interest Legal Foundation is a non-profit 501(c)(3) organization.

It is not a publicly held corporation and no corporation or other publicly held entity

owns more than 10% of its stock.

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................ iv

Jurisdictional Statement ....................................................................... 1

Statement of Issues Presented for Review ........................................... 2

Statement of the Case .......................................................................... 3

Standard of Review ............................................................................ 10

Summary of the Argument.................................................................. 11

Argument............................................................................................ 15

I.   The District Court Correctly Held that the Voter File is a
     Record Subject to Disclosure Under the NVRA ...................... 15

     A. The Voter File Falls Within the Scope of the
        NVRA's Plain Language ..................................................... 15

        1.   The Voter File "Concern[s]" the "Implementation of
             Programs and Activities Conducted for the Purpose of
             Ensuring the Accuracy and Currency of Official Lists of
             Eligible Voters[.]" ........................................................ 17

             a.   The Voter File Reflects and Is the End Product of Maine's
                  Voter List Maintenance Activities. ........................ 19

             b.   The Voter File Is a Compilation of Voter Registration
                  Applications and Records, Which Maine Uses to
                  Determine Eligibility to Vote.................................. 23

        2.   Disclosure of the Voter File is Consistent with
             Congress's Intent............................................................ 26

     B. The Secretary's Tortured Interpretation is Contrary to
        NVRA's Text and Intent and Produces Absurd Results ................... 27

        1.   "Conducted for the purpose of ensuring." ................... 27

        2.   "Implementation." ......................................................... 29

        3.   The Secretary Argument Adds Words and Qualifiers to
             the NVRA's Text That Do Not Exist........................... 31

ii

4.    Voting History Records Are Within the NVRA's Scope and the Secretary Has Waived Any Argument to the Contrary ........................................................... 33

C. The NVRA's "Structure" Supports the Foundation ........................... 34

D. No Agency Guide Can Overrule a Statute's Unambiguous Text ....... 37

II. The District Court Correctly Held that the NVRA Preempts Exception J ........................................................................... 39

A. Preemption Under the Constitution's Election Clause. ...................... 40

B. Exception J and its Related Fines Are Preempted Because They Pose Obstacles to the Achievement of Congress's Objectives .......... 42

1. The Publication Ban ........................................................... 45

a.   The Publication Ban Poses Obstacles to the NVRA's Purposes ................................................... 45

b.   The Secretary's Defense of the Publication Ban Does Not Address the Dispositive Legal Issue and Fails to Identify Legal Error ........................................... 48

2. The Use and Enforcement Bans ....................................... 56

a.   Exception J's Plain Language Refers to Maine Only ............. 56

b.   The Foundation Has Standing to Challenge the Use and Enforcement Bans ....................................... 59

3. The Fines Are Preempted ........................................... 62

Conclusion ........................................................................... 62

# TABLE OF AUTHORITIES

## *Cases*

*Atl. Fish Spotters Ass'n v. Evans*,
   321 F.3d 220 (1st Cir. 2003) ................................................... 34

*Arizona v. Inter Tribal Council of Arizona*,
   570 U.S. 1 (2013) ................................................... 4, 14, 40-41

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999) ................................................... 44

*Bellitto v. Snipes*,
   2018 U.S. Dist. LEXIS 103617 (S.D. Fla. Mar. 30, 2018)
   ........................................................ 12, 15-16, 26, 44, 47

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................... 44

*Brown v. Socialist Workers '74 Campaign Comm.*,
   459 U.S. 87 (1982) ................................................... 52

*Butterfield v. Norfolk & Dedham Mut. Fire Ins. Co.*,
   2004 ME 124, 860 A.2d 861 (Me. 2004) ................................................... 57

*Calvary Chapel of Bangor v. Mills*,
   52 F.4th 40 (1st Cir. 2022) ................................................... 61

*Capron v. Office of the AG of Mass.*,
   944 F.3d 9 (1st Cir. 2019) ................................................... 42

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ................................................... 53

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ................................................... 16, 34

*Doe v. Reed*,
   823 F. Supp. 2d 1195 (W.D. Wash. 2011) ................................................... 53

*Doe v. Reed*,
   561 U.S. 186 (2010) ................................................... 52

*Dion v. Sec'y of Health & Human Servs.*,
   823 F.2d 669 (1st Cir. 1987) ................................................... 39

*Espinoza v. Farah Mfg. Co.*,
   414 U.S. 86 (1973) ................................................................................ 39

*Ex parte Siebold*,
   100 U. S. 371 (1880) ....................................................................... 41, 52

*Griffin v. Oceanic Contractors*,
   458 U.S. 564 (1982) ................................................................................ 28

*Gross v. FBL Fin. Servs.*,
   557 U.S. 167 (2009) ................................................................................ 16

*Grunbeck v. Dime Sav. Bank, FSB*,
   74 F.3d 331 (1st Cir. 1996) .................................................................... 39

*Higgins v. New Balance Ath. Shoe, Inc.*,
   194 F.3d 252 (1st Cir. 1999) .................................................................. 34

*Husted v. A. Philip Randolph Inst.*,
   138 S. Ct. 1833 (2018) ............................................................................ 50

*Ill. Conservative Union v. Illinois*,
   2021 U.S. Dist. LEXIS 102543 (N.D. Ill. June 1, 2021) ........................ 16

*Ingersoll-Rand Co. v. McClendon*,
   498 U.S. 133 (1990) ................................................................................ 42

*Judicial Watch, Inc. v. Lamone*,
   399 F. Supp. 3d 425 (D. Md. 2019) ................................................. 15, 23

*Judicial Watch, Inc. v. Lamone*,
   455 F. Supp. 3d 209 (D. Md. 2020) ....................................................... 15

*Lamie v. United States Tr.*,
   540 U.S. 526 (2004) .......................................................................... 16, 37

*Me. Forest Prods. Council v. Cormier*,
   51 F.4th 1 (1st Cir. 2022) .................................................................. 40, 49

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ................................................................................ 42

*NAACP v. Ala. ex rel. Patterson*,
   357 U.S. 449 (1958) ................................................................................ 52

*Ocasio-Hernandez v. Fortuno-Burset*,
   777 F.3d 1 (1st Cir. 2015) ...................................................................... 10

*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015)........................................................ 42, 50

*Pa. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998)............................................................... 35

*Palmieri v. Nynex Long Distance Co.*,
  437 F.3d 111 (1st Cir. 2006)............................................56-57

*Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*,
  507 U.S. 380 (1993)............................................................... 17

*Prime Healthcare Servs. - Landmark LLC v. United Nurses & Allied Prof'ls, Local 5067*,
  848 F.3d 41 (1st Cir. 2017).................................................. 10

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016)................................. 35

*Project Vote/Voting for Am., Inc. v. Long*,
  752 F. Supp. 2d 697 (E.D. Va. 2010) ................. 18, 20, 28, 30 n.2, 46 n.6

*Project Vote/Voting for Am., Inc. v. Long*,
  813 F. Supp. 2d 738 (E.D. Va. 2011) .................................... 18

*Project Vote / Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ........11, 13, 18, 26, 29, 33, 36-37, 43, 47, 55

*Protectmarriage.com v. Bowen*,
  830 F. Supp. 2d 914 (E.D. Cal. 2011) .................................. 53

*Pub. Interest Legal Found. v. Boockvar*,
  431 F. Supp. 3d 553 (M.D. Pa. 2019).................................... 36

*Pub. Int. Legal Found. v. Chapman*,
  595 F. Supp. 3d 296 (M.D. Pa. 2022).................................... 44

*Pub. Interest Legal Found. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) ...........................15, 22-23

*Ryan v. CFTC*,
  125 F.3d 1062 (7th Cir. 1997) ........................................... 8 n.1

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n*,
  989 F.2d 1266 (1st Cir. 1993)............................................... 34

*Triangle Trading Co. v. Robroy Indus.*,
  200 F.3d 1 (1st Cir. 1999)..................................................... 10

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ................................................ 15, 25

*United States v. Machias Sav. Bank*,
   2022 U.S. Dist. LEXIS 2835 (D. Me. Jan. 6, 2022) ................................ 41

*Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*,
   390 U.S. 261 (1968) ................................................................................. 39

*Voter Reference Foundation, LLC v. Balderas*,
   616 F. Supp. 3d. 1132 (D.N.M. 2022) .................................................... 50

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ................................................................................. 11

### Constitutions, Statutes, Rules

U.S. Const. Art. I, § 4, cl. 1 ................................................................. 40-41

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1291 ........................................................................................ 1

52 U.S.C. § 20501(b) .............................................................................. 3, 29

52 U.S.C. § 20501(b)(1)-(4) ..................................................................... 42

52 U.S.C. § 20501(b)(1) ............................................................................ 50

52 U.S.C. § 20501(b)(2) ............................................................................ 49

52 U.S.C. § 20501(b)(3) .............................................. 3, 26, 40, 43, 48

52 U.S.C. § 20501(b)(4) ...................................... 3, 26, 40, 43, 48, 50

52 U.S.C. § 20507(a)(3)(B) ....................................................................... 43

52 U.S.C. § 20507(a)(4) ............................................................................ 43

52 U.S.C. § 20507(i) ................................................................................... 2

52 U.S.C. § 20507(i)(1) ........................................ 3, 11-12, 19, 32, 43

52 U.S.C. § 20507(i)(2) ......................................................................... 31, 45

52 U.S.C. § 20508(a) ................................................................................. 38

52 U.S.C. § 20508(a)(4) ............................................................................ 38

52 U.S.C. § 20510(b) ............................................................................... 1, 5

1 M.R.S. § 72(21) ....................................................................................... 58

1 M.R.S. § 408-A ................................................................ 37

21-A M.R.S. § 122(1) ......................................................... 23

21-A M.R.S. § 128(1) ......................................................... 18

21-A M.R.S. § 129(1)-(2) .................................................... 17

21-A M.R.S. § 152(2) ......................................................... 17

21-A M.R.S. § 161(2-A) ...................................................... 33

21-A M.R.S. § 161(2-A)(A)-(B) ........................................... 18

21-A M.R.S. § 180 ............................................................. 60

21-A M.R.S. § 196-A(1)(B)................................... 5, 19, 23, 25. 54

21-A M.R.S. § 196-A(1)(J) ............................................... 2, 8

21-A M.R.S. § 196-A(1)(J)(1) ............................................. 56

21-A M.R.S. § 196-A(1)(J)(2) ......................................... 45, 48

21-A M.R.S. § 162-A(2) ...................................................... 18

21-A M.R.S. § 196-A(4) ...................................................... 52

21-A M.R.S. § 196-A(5) ................................................... 2, 13

CMR 29-250-505, §1, (3)(C) ............................................... 33

CMR 29-250-505, §1, (3)(D) ............................................... 33

### *Other Authorities*

https://bangordailynews.com/2020/11/25/politics/maines-2020-election-turnout-was-among-highest-in-us/ .................................................... 54 n.9

Bethea, *Why Did Mark Meadows Register to Vote at an Address Where He Did Not Reside?*, The New Yorker, March 6, 2022, https://www.newyorker.com/news/news-desk/why-did-mark-meadows-register-to-vote-at-an-address-where-he-did-not-reside ......................................... 46 n.7

https://www.eac.gov/sites/default/files/eac_assets/1/1/Implementing%20the%20NVRA%20of%201993%20Requirements%20Issues%20Approaches%20and%20Examples%20Jan%201%201994.pdf............................................. 38 n.5

https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.. 36 n.4

Kessler, *Mark Meadows was simultaneously registered to vote in three states*, Washington Post, April 22, 2022, https://www.washingtonpost.com/politics/2022/04/22/mark-meadows-was-simultaneously-registered-vote-three-states/ .......................................... 46 n.7

https://www.maine.gov/ethics/political-activity/contributing-information ................................................................................................. 55 n.11

https://mainecampaignfinance.com/index.html#/dataDownload ................. 55

https://www.mainepublic.org/politics/2022-11-08/maine-voter-turnout-is-very-high-on-election-day-says-secretary-of-state........................................ 54 n.10

https://www.merriam-webster.com/dictionary/concerns?src=search-dict-hed ...................................................................................................... 19

https://www.merriam-webster.com/dictionary/implement.................... 30 n.2

https://www.ncsbe.gov/results-data/voter-registration-data .................. 54 n.8

https://www6.ohiosos.gov/ords/f?p=111:1 ............................................ 54 n.8

https://publicinterestlegal.org/wp-content/uploads/2023/07/Maine-EPIC-Short-Redlines.pdf ............................................................................................ 9 n.8

https://publicinterestlegal.org/wp-content/uploads/2023/07/Maine-EPIC.pdf. .................................................................................................... 9 n.8

## **JURISDICTIONAL STATEMENT**

Plaintiff-Appellee Public Interest Legal Foundation ("Foundation") brought a three-count amended complaint alleging violations of Section (8)(i) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1). (Appendix ("A") at 171.) The district court had jurisdiction pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States, and 52 U.S.C. § 20510(b), because the action seeks declaratory and injunctive relief under the NVRA. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court correctly held that Maine's official list of eligible registrants ("Voter File") is a record subject to public inspection and reproduction under Section 8(i) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i).

2.      Whether the District Court correctly held that the NVRA preempts the restrictions Maine law places on the Voter File's use, 21-A M.R.S.A. § 196-A(1)(J), and the associated fines, 21-A M.R.S.A. § 196-A(5).

## STATEMENT OF THE CASE

### Introduction

With the NVRA, Congress intended to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). To accomplish these goals, Congress created the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), a broad and powerful federal open records law, and a private right of action, 52 U.S.C. 20510(b). These two components serve vital oversight and enforcement functions, which ultimately promote *all* the NVRA's purposes, 52 U.S.C. § 20501(b). In short, Congress intended maintenance of state voter rolls to be transparent, because oversight and accountability safeguard the right to vote.

As a threshold question, this case asks whether Maine's eligible voter list ("Voter File") is a record subject to public disclosure under the NVRA. Like all other courts confronting the issue have done, the District Court answered that question "yes." The District Court's decision should be affirmed because it was compelled by the NVRA's plain language and comports with Congress's intent. In simplest terms, Maine's Voter File is the culmination and end product of all of Maine's voter list maintenance activities. The Voter File thus squarely "concerns" those activities in every sense of the word.

3

The remaining question for this Court is whether Maine may control and restrict the public's use of a public record and impose crippling fines for alleged misuse. What does Maine wish to control and restrict? Speech. Research. Education. Law enforcement. Accountability. Maine is limiting criticism of government officials. Maine's position would even muzzle the Press from speaking about what it finds in public records regarding the job performance of government officials.

The District Court concluded that "[t]he Public Disclosure Provision's disclosure mandate … does not allow a state to impose these restrictions." (Add. 013.) Why not? Because these restrictions pose obstacles to the accomplishment and execution of Congress's purposes under the NVRA. (Add. 013-014.) The District Court correctly held that because Maine's restrictions pose such obstacles they are preempted and unenforceable under the Constitution's Elections Clause, which, upon Congress, "confers the power to alter [state] regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013).

Applying these established principles, the District Court concluded that the "NVRA preempts Exception J." (Add. 017.) The Secretary offers no compelling

4

reason to disturb the District Court's reasoned judgment, nor could she under the Elections Clause.

***Statement of Facts***

1.      Maine's Voter File is a report generated from Maine's Central Voter Registration System ("CVR") that contains the following voter record information for each registered voter who is eligible to vote in Maine as of the date the report is generated:

> [T]he voter's name, residence address, mailing address, year of birth, enrollment status, electoral districts, voter status, date of registration, date of change of the voter record if applicable, voter participation history, voter record number and any special designations indicating uniformed service voters, overseas voters or township voters.

21-A M.R.S. § 196-A(1)(B).

2.      The Foundation requested a copy of Maine's Voter File pursuant to the NVRA's Public Disclosure Provision. (A200-A201, ¶¶ 1, 8.)

3.      Defendant Secretary of State ("Secretary") denied the Foundation's request for the Voter File. (A200-A201, ¶¶ 2, 9-10.)

4.      As required by 52 U.S.C. § 20510(b), prior to filing this action, the Foundation notified the Secretary in writing that her office is in violation of the NVRA for failure to permit inspection and duplication of records as required by the NVRA's Public Disclosure Provision. (A200, ¶ 3.)

5

5.    The Secretary did not cure her violation of the NVRA in the time afforded by the NVRA. (*See* A201, ¶¶ 6-9; A205-A208, ¶ 6-27.)

6.    The Secretary has not provided the "Party/Campaign Use Voter File" to the Foundation. (A201, ¶ 10.)

7.    The Foundation's regular programmatic activities include, but are not limited to (1) evaluating how and whether states and/or local governments are complying with voter list maintenance laws; (2) pursuing legal action to enforce state and federal voter list maintenance laws; (3) analyzing registration and voting data; (4) educating the public through published reports, blog posts, press releases, newsletters, and emails; and, (5) providing voter list maintenance leads and potentially irregular registration and voting data to state and local governments. (A208-A209, ¶ 28; *see also* Add. 014-015.)

8.    The Foundation regularly analyzes voter participation history to study (1) enforcement of voter list maintenance laws that depend on voting or attempted voting; (2) whether any registrant cast more than one vote in the same election in the same jurisdiction; (3) whether any registrant cast votes in two or more local jurisdictions or states in the same election; (4) whether votes were cast by ineligible registrants; (5) whether provisional voting laws are properly enforced; and, (6) the extent of voter participation. (A209, ¶ 29.)

6

9.    The Foundation uses a state's voter roll and other voter registration and voting records to monitor, study, and evaluate that particular state's voter list maintenance activities and also those of other jurisdictions and states. (A209, ¶ 30.)

10.    The Foundation uses a state's voter file and other voter registration and voting records to enforce voter list maintenance laws. (A209, ¶ 31.)

11.    The Foundation uses a state's voter roll and other voter registration and voting records to educate the general public and government officials, including through the Internet. (A209-A210, ¶ 32.)

12.    The Foundation uses a state's voter roll and other voter registration and voting records to provide voter list maintenance leads and potentially irregular registration and voting data to state and local governments. (A210, ¶ 33.)

13.    The Foundation uses registrants' personally identifying information— such as name and address—to conduct the regular, programmatic activities described in the above paragraphs. (A210, ¶ 34.)

14.    The Foundation currently intends to use the Voter File to conduct the regular, programmatic activities described in the above paragraphs, including (1) monitoring, study, analyzing, and evaluating the list maintenance activities of other jurisdictions and states; (2) enforcing voter list maintenance laws in Maine and in other states, including filing actions under the NVRA's private-right-of-action

7

provision; (3) educating the general public and government officials about list

maintenance activities in Maine and other states, including through the Internet; (4)

sharing voter list maintenance leads and potentially irregular registration and

voting data with state and local governments within and outside Maine. (A211, ¶

35.)

15.     Where necessary, the Foundation intends to use personally identifying

information—such as name, address, and voter identification number—to conduct

those activities. (A211, ¶ 36.)

16.     The Foundation intends to develop more specific plans for the Voter

File after Defendant provides it to the Foundation. (A211, ¶ 37.)

***Procedural History***

The Foundation requested the Voter File more than three and a half years

ago, on October 17, 2019. (A188.) Maine denied the request, and on February 19,

2020, the Foundation filed this action, alleging that the Secretary violated the

NVRA by denying the Foundation access to the Voter File (Count I). (ECF No. 1.)

While cross-motions for summary judgment were pending, the Maine Legislature

amended the challenged law to add "Exception J," 21-A M.R.S. § 196-A(1)(J).[1]

---

[1] The Electronic Privacy Information Center ("EPIC"), which has filed a brief in support of the Secretary, describes its role before this Court "as *amicus curiae*." (Doc. 00118021589.) "The term '*amicus curiae*' means friend of the court, not friend of a party." *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997). This

The Foundation amended its complaint to add claims that the NVRA preempted Exception J's use restrictions (Count II) and associated fines (Count III). (A171.) The District Court denied the Secretary's motion to dismiss on March 4, 2022. (Add. 019.) The District Court dismissed Count I as moot. (*See* Add. 001.) The District Court entered judgment for the Foundation on Counts II and III. (*See id*.) This appeal followed. (A354.)

The Secretary moved to stay the portion of the judgment concerning the Publication Ban, which the District Court granted on June 7, 2023. (ECF No. 96.)

---

description would thus appear inappropriate here considering EPIC worked directly with the Secretary to draft Exception J. *See* https://publicinterestlegal.org/wp-content/uploads/2023/07/Maine-EPIC-Short-Redlines.pdf (draft bill with EPIC's comments, suggestions, and edits) (last accessed July 18, 2023). This fact appears nowhere in EPIC's statement of interest. For more information on Exception J's history, please visit this web address: https://publicinterestlegal.org/wp-content/uploads/2023/07/Maine-EPIC.pdf (last accessed July 18, 2023). These records were obtained through an open records request.

## <u>STANDARD OF REVIEW</u>

This Court "review[s] a district court's grant of summary judgment *de novo.*" *Ocasio-Hernandez v. Fortuno-Burset*, 777 F.3d 1, 4 (1st Cir. 2015). The Court "may affirm the entry of summary judgment on any ground made manifest by the record, so long as the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Prime Healthcare Servs. - Landmark LLC v. United Nurses & Allied Prof'ls, Local 5067*, 848 F.3d 41, 45 (1st Cir. 2017) (citations and quotations omitted). "Conclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." *Triangle Trading Co. v. Robroy Indus.*, 200 F.3d 1, 2 (1st Cir. 1999) (citations and quotations omitted).

## SUMMARY OF THE ARGUMENT

Thirty years ago, Congress decided that decisions about who is and is not eligible to vote should be transparent and publicly accessible. That decision is embodied in the NVRA's Public Disclosure Provision, which mandates that "all records" related to the implementation of voter list maintenance activities are subject to public inspection. 52 U.S.C. § 20507(i)(1).

The NVRA's Public Disclosure Provision is no ordinary transparency law. Its unique and expansive scope is deliberate because it is designed to protect the right that is "preservative of all rights"—the right to vote. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012) ("*Project Vote*"). To that end, Congress designed the Public Disclosure Provision to shed light on *all* activities that determine who belongs and who does not belong on the voter rolls. As one federal district court put it, the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs. Accordingly, election

11

officials must provide full public access to all records related to their list maintenance activities, including their voter rolls." *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12-13 (S.D. Fla. Mar. 30, 2018). To the Foundation's knowledge, courts are uniform in their view that the voter roll is a record subject to disclosure under the NVRA.

The Secretary seeks reversal upon an incorrect interpretation of the NVRA that strays far from the plain-meaning analysis this Court must conduct. The Secretary's view finds no support in the NVRA's text or in any court opinion to date. The NVRA's Public Disclosure Provision unambiguously requires public inspection of "all records concerning the implementation" of voter list maintenance activities. 52 U.S.C. § 20507(i)(1). Maine's Voter File is such a record because it is the culmination and product of Maine's voter list maintenance activities, including, as the District Court found, the "end result of the entry of voter registration applications." (Add. 030.) The Voter File squarely "concerns" the activities Maine implements to keep its records accurate. Indeed, it is the ultimate list maintenance record.

In contrast, Maine offers a tortured reading of the NVRA's text that, if adopted, would cause absurd results, chief among them the concealment of records showing who is and who is not eligible to vote and how eligibility determinations

12

were made by government officials. Such an outcome would erode transparency and undermine the NVRA's purposes, because "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339. Congress did not limit the NVRA's sweeping inspection provision to a subset of activities, as the Secretary claims. Instead, Congress drafted the NVRA broadly, and that choice has enormous significance and must be given effect, as it has by other courts.

The District Court's finding that the NVRA preempts Exception J should also stand. Maine law prohibits the activities Congress intended and which promote the NVRA's purposes. In particular, Maine law prohibits the public from using Maine's Voter File to study and remedy list maintenance errors in all other states, where, for example, duplicate registrations may exist with Maine's registrations. Maine law also silences those who wish to educate the public about whether or not public officials are discharging their duties in compliance with state and federal law. Anyone who speaks about public information and whether public officials are complying with the most basic elements of state and federal law using Maine's Voter File risks crushing fines. 21-A M.R.S.A. § 196-A(5). Preemption is ultimately a function of Congress's intent, and it does not follow that Congress would make list maintenance records public so that states may then prosecute and

13

fine citizens who exercise federal rights. Maine law is plainly an obstacle to the accomplishment of the NVRA's purposes and is therefore preempted and invalid under the United States Constitution. *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013). For these reasons, the judgment below should stand.

# **ARGUMENT**

I. **The District Court Correctly Held that the Voter File is a Record Subject to Disclosure Under the NVRA.**

### A. The Voter File Falls Within the Scope of the NVRA's Plain Language.

The uniform weight of authority supports the District Court's interpretation of the NVRA. To the Foundation's knowledge, every single court addressing this question has found the voter roll, or a portion thereof, to be inside the NVRA's scope. *See Pub. Interest Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 943-44 (C.D. Ill. 2022) ("Defendants acted in violation of the Public Disclosure Provision of the NVRA when Defendants refused to make available for viewing and photocopying the full statewide voter registration list."); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 438-442, 446 (D. Md. 2019) (holding that plaintiff "is entitled to the voter registration list for [a] County that includes fields indicating name, home address, most recent voter activity, and active or inactive status"); *Judicial Watch, Inc. v. Lamone*, 455 F. Supp. 3d 209 (D. Md. 2020) (holding that plaintiff is entitled to date-of-birth information under NVRA); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014) ("[T]he Voter Roll is a 'record' and is the 'official list[] of eligible voters' under the NVRA Public Disclosure Provision."); *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S.

15

Dist. LEXIS 103617, at *13 (S.D. Fla. Mar. 30, 2018) ("[E]lection officials must provide full public access to all records related to their list maintenance activities, including their voter rolls."); *see also Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 U.S. Dist. LEXIS 102543, at *15 (N.D. Ill. June 1, 2021) (holding, at the pleading stage, that statewide voter roll "falls within Section 8(i)'s disclosure provision")).) There is no reason to answer differently here.

The parties agree that when interpreting the Public Disclosure Provision, the Court should begin with the statutory text. (Secretary's Brief ("Brief") at 23.) "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) (citations and quotations omitted). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (citations and quotations omitted); *See also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citations omitted). "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to

carry their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (citations and quotations omitted).

### 1. The Voter File "Concern[s]" the "Implementation of Programs and Activities Conducted for the Purpose of Ensuring the Accuracy and Currency of Official Lists of Eligible Voters[.]"

The record shows that Maine conducts programs and activities for the purpose of ensuring the accuracy and currency of official lists of eligible voters. Maine's Central Voter Registration ("CVR") database is used to carry out these programs and activities. (*See* ECF No. 58 at 3-4.) The Secretary did not dispute these facts below and does not dispute them here.

One of Maine's voter list maintenance activities is creating new voter registration records for people who are not registered to vote. *See* 21-A M.R.S. § 152(2). Entering new registration information into the CVR is an activity "conducted for the purpose of ensuring the accuracy and currency" of the voter roll. Another of Maine's voter list maintenance activities is making changes and updates to voter record information stored in the CVR. *See* 21-A M.R.S. § 129(1)-(2). Changing this information is an activity "conducted for the purpose of ensuring the accuracy and currency" of the voter roll. Maine law further requires cancellation of a voter registration record when the registrant moves to another

jurisdiction in or outside Maine, 21-A M.R.S. § 161(2-A)(A)-(B), and officials will also cancel a registration record when the registrant dies, 21-A M.R.S. § 128(1), or is in inactive status and fails to vote for two consecutive general elections, 21-A M.R.S. § 162-A(2), and, when a registrant requests cancellation. The registrar must "keep a record" of all additions and cancellations. 21-A M.R.S. § 161(5). Again, cancelling registrations is an activity "conducted for the purpose of ensuring the accuracy and currency" of the voter roll. In addition, Maine law requires that "[b]efore printing the final incoming voting list prior to any election … [t]he registrar shall review the records of marriage, death, change of name and change of address … and shall revise the central voter registration system accordingly." 21-A M.R.S. § 128(1).

In an opinion ultimately affirmed by the Fourth Circuit in compelling and unambiguous fashion, the Eastern District of Virginia concluded that "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 706 (E.D. Va. 2010); *summary judgment granted by Project Vote/Voting for Am., Inc. v. Long*, 813 F. Supp. 2d 738 (E.D. Va. 2011), *affirmed by Project Vote*, 682 F.3d 331.

18

Each of Maine's activities described above is a "program" or "activity" within the purview of the NVRA because it is conducted to make sure Maine's registration records and eligible voter list are "errorless" and contain the "most recent" information for each registrant.

The remaining question for the Court is whether the Voter File "concern[s]" Maine's voter list maintenance activities. 52 U.S.C. § 20507(i)(1). The common and ordinary meaning of the word "concern" is "to relate to." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/concerns?src=search-dict-hed (last accessed July 15, 2023). The Voter File plainly relates to Maine's voter list maintenance activities in at least two ways.

### a. The Voter File Reflects and Is the End Product of Maine's Voter List Maintenance Activities.

The CVR, and the Voter File specifically, contains information about each eligible registrant, including name, addresses, and year of birth. 21-A M.R.S. § 196-A(1)(B); (*see also* Add. 006 n.4). As described previously, the CVR is used to implement the activities Maine conducts to keep that voter record information current and accurate. The Voter File "captures data on voters who are eligible to vote in Maine as of the date the report is generated" and that data is current as of the date it is generated. (ECF No. 35-1, ¶ 40, 42; A78 at 2 (RFA No. 3); A20 at 7:11-14 (Flynn Transcript).) In other words, at the time it is generated the Voter

19

File reflects and contains each registrant's "most recent" information. *Project Vote*, 752 F. Supp. 2d at 706. The Voter File is thus the culmination and end product of the implementation of Maine's voter list maintenance activities. Put differently, a straight line can be drawn between Maine's registration activities (the start) and the Voter File (the finish). The Voter File plainly "concerns"—or relates to—Maine's activities and is therefore within the NVRA's scope.

The following hypothetical—proposed to the Secretary's Rule 30(b)(6) designee in deposition—reinforces this conclusion:

23· ·example.· Let's say that today, you used the CVR to

24· ·generate the Party/Campaign Use Voter File and you look at

25· ·that file -- the voter file and the first person on the

1· ·list is Jane Doe and the voter file says that Jane Doe is

·2· ·registered at 1234 Main Street.· Do you follow me so far?

·3· · · ·A· · I guess.· We will see.

·4· · · ·Q· · If I'm not making sense, I will back up.· And a

·5· ·week later, Jane Doe gets married and she decides to

·6· ·legally change her name -- her last name and move into her

·7· ·husband's house, so then Jane Doe then submits a voter

·8· ·registration application under her new last name of Smith

20

·9· ·and using her new address of 1234 State Street.· Does that

10· ·make sense so far?

11· · · ·A· · Yes, I'm sorry, yes.

12· · · ·Q· · The CVR would be used to update Jane's

13· ·registration record to reflect her new last name and her

14· ·new address, correct?

15· · · ·A· · Yes.

16· · · ·Q· · After those updates are made and take effect in

17· ·the CVR, you again use the CVR to generate a new copy of

18· ·the Party/Campaign Use Voter File.· Would the new copy of

19· ·the Party/Campaign Use Voter File that you just generated

20· ·now list Jane's new last name and address?

21· · · ·A· · That's correct.

22· · · ·Q· · It would reflect the changes she made on her voter

23· ·registration application, correct?

24· · · ·A· · Yes.

25· · · ·Q· · So is it correct to say that when changes and

·1· ·updates are made to an individual voter registration record

·2· ·like with Jane Doe, that those updates are then reflected

21

·3· ·on the Party/Campaign Use Voter File the next time it is

·4· ·generated?

·5· · · ·A· · The Party/Campaign Use Voter File will reflect the

·6· ·current data for each voter on the date that the applica --

·7· ·that the file is generated, so it would show under the new

·8· ·name and the new address.

(A67-69 at 54:22-56:8 (Flynn Transcript).) The Voter File reflects—and therefore "concern[s]" and "relates to"—Maine's activities conducted to keep each eligible voter's official information current and accurate—here, a change to the voter's name and address. There is no credible argument to the contrary.

*Pub. Interest Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022) lends further support to this rationale. In that case, Defendants "argue[d] that the words 'all records' are qualified only by the descriptive phrase 'concerning the implementation of programs and activities.' That descriptive phrase, Defendants' argument goes, means that the NVRA only mandates the public disclosure of data or programs designed to maintain the statewide voter registration list." *Matthews*, 589 F. Supp. 3d at 940. The Court disagreed.

> [T]hat argument puts an unbalanced emphasis on the phrases "concerning the implementation of programs and activities" and "for the purpose of ensuring the accuracy and currency of the official list of eligible voters." On balance, the two phrases, when read together, make

22

> clear that any record, be it data regarding maintenance activities, the processes involved in the maintenance activities, <u>or the output of those maintenance activities, including the statewide voter registration list, must be made available to the public</u>. Indeed, it would not make sense if the list, as the result of the maintenance activities, could not be viewed if the purpose of viewing the activities is to ensure the output is correct.

*Matthews*, 589 F. Supp. 3d at 940-41.

Maine's Voter File is similarly "the output" of Maine's maintenance activities and thus subject to disclosure under the NVRA's plain meaning. *See id*. at 941 ("When every word and phrase in the Public Disclosure Provision is given equal weight, 'all records' must include the statewide voter registration list.").

### b. The Voter File Is a Compilation of Voter Registration Applications and Records, Which Maine Uses to Determine Eligibility to Vote.

Similarly, the District Court correctly held that the Voter File is public record under the NVRA because "[t]he Voter File is a compilation of voter registration applications" (Add. 029 (citing 21-A M.R.S.A. §§ 122(1) & 196-A(1)(B))), which Maine evaluates to determine the applicant's eligibility.

> When a state registrar reviews voter applications and enters information from those applications into the "central voter registration system" from which the Voter File is produced, she engages in a "program" or "activity." <u>See Project Vote</u>, 682 F.3d at 335. "Moreover, the 'program' and 'activity' of evaluating voter registration applications is plainly 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.' . . . It is unclear what other purpose it would serve." <u>Id</u>. Finally, the Voter File is a "record[] concerning the

implementation of" such a "program[] and activit[y]" because it represents the end result of the entry of voter registration applications, as described above. 52 U.S.C. § 20507(i)(1); see Project Vote, 682 F.3d at 335–36.

(Add. 029-030.)

The District Court's conclusion is faithful to the NVRA's plain text and consistent with the reasoning of other courts addressing this issue. For example, in *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), the court granted the plaintiffs summary judgment, holding that a list of Maryland's registered voters is a "record" covered by the NVRA's Public Disclosure Provision. *Judicial Watch*, 399 F. Supp. 3d at 439. Because "a voter list is simply a pared down compilation of voter registrations," *id*. at 440, the court reasoned, it is likewise a "record" covered by the NVRA's Public Disclosure Provision, *id*. at 440-442.

The Voter File is likewise a "compilation of voter registrations." *Id*. at 440. Indeed, the information contained in the Voter File is pulled directly from the official voter record information stored in the CVR, the information that election officials endeavor to keep current and "on which [Maine] election officials rely to monitor, track, and determine voter eligibility." *Judicial Watch*, 399 F. Supp. 3d at 439. The Voter File is thus a record covered by the NVRA.

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) also

supports the Foundation. In that case, the plaintiff sought a "a complete list of

all Mississippi voters [in] all status categories" *Id*. The court observed,

> Mississippi has an electronic election recordkeeping system, SEMS, that contains its Voter Roll information. The Voter Roll is created from data in SEMS and is maintained by the State. Counties receive voter registration applications from individual registrants and must scan the applications and other pertinent registration documentation into SEMS.
>
> …
>
> The Court likewise concludes that the Voter Roll is a "record" and is the "official list[] of eligible voters" under the NVRA Public Disclosure Provision. The process of compiling, maintaining, and reviewing the voter roll is a program or activity performed by Mississippi election officials that ensures the official roll is properly maintained to be accurate and current.

*Id*.

Maine also has an electronic election record keeping system—the CVR. The

Voter File is generated from information stored in the CVR, including names and

addresses, and is Maine's current eligible voter list. 21-A M.R.S. § 196-A(1)(B).

"The process of compiling, maintaining, and reviewing" the Voter File is an

activity performed by Maine election officials "that ensures the official roll is

properly maintained to be accurate and current." *True the Vote*, 43 F. Supp. 3d at

723. The Voter File is a "record" of that activity and thus within the NVRA's

broad scope.

25

### 2. Disclosure of the Voter File is Consistent with Congress's Intent.

The District Court's holding is not only textual correct, but also consistent with express Congressional intent. The NVRA was enacted for four express purposes, including "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). The NVRA's Public Disclosure Provision reflects Congressional intent by allowing the public to monitor the activities of government as they concern the right to vote:

> [The NVRA's Public Disclosure Provision is] available to any member of the public … and convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs. [52 U.S.C. § 20507(i)]. Accordingly, election officials must provide full public access to all records related to their list maintenance activities, including their voter rolls. *Id*. This mandatory public inspection right is designed to preserve the right to vote and ensure that election officials are complying with the NVRA. *Project Vote v. Long*, 682 F.3d. 331, 335 (4th Cir. 2012).

*Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13. Indeed, Congress made all list maintenance records subject to public inspection precisely so that the public can enjoy a transparent election process and assess compliance with federal laws. "Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections." *Project Vote*, 682 F.3d at 339-40.

26

**B. The Secretary's Tortured Interpretation is Contrary to NVRA's Text and Intent and Produces Absurd Results.**

The Secretary strains to narrow the NVRA's scope with several arguments, none of which is supported by the statute's words, and which are, in fact, defied by those words. Furthermore, the Secretary's interpretation is plainly contrary to the NVRA's intent because it would absurdly imbalance and ultimately obliterate the transparency Congress intended.

**1. "Conducted for the purpose of ensuring."**

The Secretary first posits that the statute's use of the word "ensuring" means the Public Disclosure Provision is limited to activities that "guarantee" that voter roll data is accurate. (Brief at 27.) This alone is an incorrect interpretation because no state can guarantee perfection. American voter rolls are fraught with error and discrepancies. Mistakes happen. Deciding whether records are public based on the error rate of the underlying activity is an absurd standard under which records related to *unreliable* activities—those that demand the most transparency—would be shielded from view. To be sure, the Foundation wishes to use the Voter Roll to assist states in maintaining accurate voter rolls.

The Secretary also contends that the NVRA is even further limited to activities that can be classified as "oversight" activities *and* those that "make sure that data, once it is in the system, *remains* accurate and current." (Brief at 27

27

(emphasis in original).) Falling outside the scope of the law, the Secretary asserts, are "day-to-day administrative functions such as adding individual registrants to the system." (*Id*.) This interpretation is plainly contrary to what Congress wrote. The distinction between "oversight" and "day-to-day" functions finds no support from the word "ensuring" or any other word in the NVRA. The same goes for the distinction between adding new registrants and maintaining existing data. The Public Disclosure Provision does not exclude records related to newly added registrants by word, context, or intent.

The Eastern District of Virginia considered and squarely rejected this very argument, concluding, "There is ample support throughout the NVRA, therefore, for the conclusion that the Public Disclosure Provision is meant to cover records concerning the implementation of voter registration procedures, which by necessity include voter registration applications." *Project Vote*, 752 F. Supp. 2d at 709.

Nor are these distinctions even helpful to the Secretary. The Voter File is equally the product of newly added voter data and the maintenance of existing data. It "concerns," relates to, and reflects both of those activities. To find that only records of the latter activity are public would produce the absurd result of making only a portion of the Voter File a public document, and "absurd results are to be avoided," *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982).

More fundamentally, the wholesale exclusion of voter registration activities from the Public Disclosure Provision's reach would undermine the NVRA's separate goal of "increase[ing] the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1), because "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

Further, the Secretary adds the phrase "conducted for the purpose" means only voter list maintenance activities that are "purposeful" are covered by the NVRA. (Brief at 28-29.) On the other hand, "Programs and activities that might have the effect of ensuring accuracy and currency, but are not intentionally designed for that purpose, are excluded from § 8(i)'s reach." (*Id*.) The Secretary does not explain what she means by "might have the effect of ensuring accuracy or currency," who decides whether something is purposeful, or why this distinction is relevant. In the end it does not matter because the Voter File is the product of numerous purposeful and intentional—and legally mandated—activities, including adding, updating, and deleting registration data.

### 2.  "Implementation."

The Secretary next posits that the word "implementation" provides a "significant limitation" on the Public Disclosure Provision's scope. In the

Secretary's view, the NVRA covers only "records that would describe, document, or otherwise concern how the relevant 'programs and activities' were put into practice." (Brief at 30.) Such records would include "correspondence" about voter list maintenance activities and "documentation showing specific edits of voter information," but would not include the Voter File itself. (*Id*.)

The Secretary's constrained view is not supported by the text's plain meaning and has been rejected by every court that has addressed the NVRA's scope. "Implement" means "carry out"[2] and, as addressed earlier, "concerning" means "related to." Accordingly, the statute is very broad. "[A]ll records" that merely relate to carrying out Maine's voter list maintenance activities are covered. The Voter File, as the end product of all voter list maintenance activities, "relates to" the "carrying out" of those activities and is therefore within the law's scope. Without the Voter File, nobody can check the work and the effectiveness of government officials.

The Secretary's position is also undermined by Section 8(i)(2), which explains that public records "shall include lists of the names and addresses of all

---

[2] https://www.merriam-webster.com/dictionary/implement (last accessed July 19, 2023); *see also Project Vote*, 752 F. Supp. 2d at 707 (discussing "implementation").

30

persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2). Such a list of names does not describe or document "how" any activity was "put into practice." (Brief at 30.) Yet the list is expressly within Section 8(i)(1)'s scope.

Numerous other critical records would be kept as secrets under the Secretary's view, including voter registration applications—the very document that determines eligibility—and records establishing death and change in residency— the very documents that may result in disenfranchisement. A statute expressly designed to promote election integrity and accurate voter rolls does not tolerate such an absurd result.

### 3. The Secretary Argument Adds Words and Qualifiers to the NVRA's Text That Do Not Exist.

According to the Secretary, "the Voter File is not a list maintenance tool; it is undisputed that the Secretary does not use it do list maintenance." (Brief at 24.) The Secretary is again inserting words into the NVRA that Congress never used. Neither the word "tool" nor the phrase "used to do list maintenance" are found in the Public Disclosure Provisions text. Nor can the actual words Congress used be read to impose such a limitation. What the NVRA actually covers is much

31

broader—all records "concerning" list maintenance activities. 52 U.S.C. §

20507(i)(1).

The Secretary next claims that the Voter File falls outside the NVRA

because it "does not say whether a particular voter's registration information has

ever been altered by list maintenance activities." (Brief at 25.) Not so. Each

registrant included on the Voter File was put there because someone entered the

registrant's information into the CVR. "When a state registrar reviews voter

applications and enters information from those applications into the 'central voter

registration system' from which the Voter File is produced, she engages in a

'program' or 'activity.'" (Add. 029-030.) Even if the applicant's information is

never thereafter "altered," it remains the product of a voter list maintenance

activity.[3]

The Secretary further claims that the Voter File is outside the NVRA's scope

because it "does not include any information on cancelled registrations." (Brief at

25.) This makes no difference because the Public Disclosure Provision is not

limited to cancellation records, but rather applies equally to "all records" described

---

[3] For the same reason, the Secretary is wrong when she claims that the Voter File "includes information on numerous Maine voters whose data has never been affected by list-maintenance activities." (Brief at 25.) Putting the registrant on the list is a list maintenance activity, for starters.

in Section 8(i). *Project Vote*, 682 F.3d at 337 ("[T]he NVRA's disclosure

requirement is not limited to voter removal records.").

### 4. Voting History Records Are Within the NVRA's Scope and the Secretary Has Waived Any Argument to the Contrary.

The Secretary concedes—as she must—that "*some* of the data in the Voter

File is derived from individual voter registration cards." (Brief at 37 (emphasis in

original).) She nevertheless quibbles with the District Court's characterization of

the Voter File as a "compilation of voter registration applications" because "voter

participation history" is not sourced from registration cards. (*Id*.) While that may

be true, it does not change the outcome because voting history records are

independently within the NVRA's scope.

The Secretary has promulgated rules "for conducting voter list maintenance

required by the National Voter Registration Act of 1993." 21-A M.R.S. § 161(2-

A). The Secretary's rules require election officials to make decisions about

eligibility based on a review of voting history records. For example, "[i]f a

registrant designated as inactive votes [or] attempts to vote … the inactive

designation next to the registrant's name must be removed." CMR 29-250-505, §1,

(3)(C). In addition, "[i]f a registrant designated as inactive fails to engage in any of

the activities listed in paragraph C above"—*e.g.*, voting or attempted voting—"for

33

a period of two consecutive general elections, the registrant may be removed from the voter list." CMR 29-250-505, §1, (3)(D).

In other words, voting history records determine whether certain inactive registrants are removed from the Voter File. Voting history records thus plainly "concern[]" a core voter list maintenance activity—removal— and those records are therefore public under the NVRA.

Furthermore, the Court may consider any argument concerning voting history records waived because the Secretary did not raise them below. *Higgins v. New Balance Ath. Shoe, Inc.*, 194 F.3d 252, 258 (1st Cir. 1999).

### C. The NVRA's "Structure" Supports the Foundation.

"[I[n cases of statutory interpretation, the language of the statute enjoys preeminence." *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n*, 989 F.2d 1266, 1270 (1st Cir. 1993). "When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not consult other aids to statutory construction." *Atl. Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003). The Supreme Court is clear on this point. *Germain*, 503 U.S. at 253-54. Importantly, "the fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate

ambiguity. It demonstrates breadth.'" *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citations omitted).

The Secretary does not identify any ambiguous words, much less why those words are ambiguous. Nor could she. As explained earlier and worth noting again, each of the NVRA's operative words has a clear and common dictionary definition that comports with the statute's context and purposes. To the Foundation's knowledge, none of the courts that have considered the NVRA's text has identified *any ambiguity*. In fact, at least one court has expressly concluded that "there is no ambiguity here." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1341 (N.D. Ga. 2016).

Even if the Court consults the NVRA's "structure," it should find no reason to overrule or alter the statute's plain meaning. First, the Secretary claims that if Congress intended for voter rolls to be public records, the Public Disclosure Provision would refer to them specifically. (Brief at 39.) That is an untenable position, especially when Congress used the word "all" in the NVRA. Prior to the NVRA's enactment, there were virtually no federally mandated voter list maintenance requirements—except for, perhaps, more generally applicable civil rights laws, like the Voting Rights Act. Congress was tasked with drafting a public records tool to capture the activities and attendant records of forty-four different

35

states.[4] It would have been an exercise in absurdity for Congress to enumerate all relevant records, or even relevant *categories* of records. Instead, Congress followed the most prudent path by drafting broad language that covers "all" records related to list maintenance programs *and* activities. *See Pub. Interest Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 560 (M.D. Pa. 2019) ("[T]he [NVRA's] Disclosure Provision contemplates an *indefinite* number of programs *and* activities.") (emphasis in original). There are scores of voter list maintenance records not specifically mentioned in the NVRA, but that does not mean Congress intended to *exclude* them from the statute, especially when they are encompassed by the text.

The Secretary's contention that the records described in Section 8(i)(2) should be considered a limitation was addressed and squarely rejected by the Fourth Circuit in *Project Vote*, where the Court concluded, "[T]he term 'shall include' sets 'a floor, not a ceiling.'… Courts have repeatedly indicated that 'shall include' is not equivalent to 'limited to.'" 682 F.3d at 337.

The Secretary fundamentally takes issue with the NVRA's breadth. Yet that issue was decided in Congress in 1993. There is nothing inherently suspect about a

---

[4] Six States (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming) are exempt from the NVRA. https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last accessed July 19, 2023).

broadly written statute. Public records laws are almost universally drafted for maximum transparency. For example, the Maine Freedom of Access Act provides, "Except as otherwise provided by statute, a person has the right to inspect and copy any public record in accordance with this section … ." 1 M.R.S. § 408-A (emphasis added).

Congress chose words of "great breadth." *Project Vote*, 682 F.3d at 336 ("[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth."). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534 (2004). The District Court did exactly that.

The Secretary's position allows Maine to escape public scrutiny of its job performance and whether she is meeting her NVRA obligations. Congress passed the NVRA as written to accomplish the very opposite.

### D. No Agency Guide Can Overrule a Statute's Unambiguous Text.

The Secretary's reliance on the "FEC's Guide to Implementing the NVRA" ("FEC Guide") suffers from multiple defects. For starters, Congress did not authorize the FEC, or its successor, the Election Assistance Commission (EAC), to implement the NVRA, as the Secretary claims. (Brief at 42.) Regulatory authority

37

was deliberately kept far away from the FEC. Instead, Congress gave the
FEC/EAC three minor, specific, and limited jobs. *See* 52 U.S.C. § 20508(a). One
of these jobs is to "provide information to the States with respect to the
responsibilities of the States under this Act." 52 U.S.C. § 20508(a)(4). A charge to
"provide information" is not a Congressional delegation of authority to implement
or interpret a federal statute. In fact, the FEC affirmatively and loudly disavowed
having any such authority in the FEC Guide's "Preface," which the Secretary omits
from her Addendum.

It is very important to note, however, that the Federal Election Commission does *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets the requirements of the Act. Indeed, the civil enforcement of the Act is specifically assigned to the Department of Justice.

**THIS DOCUMENT, THEN, IS INTENDED ONLY AS A GENERAL REFERENCE TOOL. ANY SUGGESTIONS CONTAINED IN THIS DOCUMENT ARE PURELY HEURISTIC AND ARE OFFERED WITHOUT FORCE OF LAW, REGULATION, OR ADVISORY OPINION. NO DECISION REGARDING THE IMPLEMENTATION OF ANY FORMS, PROCEDURES, OR CONFORMING STATE LEGISLATION SHOULD BE MADE ON THE BASIS OF THIS DOCUMENT ALONE. SUCH DECISIONS SHOULD BE MADE ONLY AFTER CONSULTATION WITH YOUR STATE LEGAL AUTHORITY.**

FEC Guide at P-1.[5] This alone counsels against giving the FEC Guide any weight.

Even in situations when an agency has legitimate authority to administer a
statute—which is not the case here— "the courts will reject an agency

---

[5] *Available at*
https://www.eac.gov/sites/default/files/eac_assets/1/1/Implementing%20the%20N
VRA%20of%201993%20Requirements%2Issues%20Approaches%20and%20Ex
amples%20Jan%201%201994.pdf (last accessed July 17, 2023).

interpretation which conflicts with congressional intent." *Grunbeck v. Dime Sav. Bank*, *FSB*, 74 F.3d 331, 336 (1st Cir. 1996). In addition, "where there are 'compelling indications' that the agency is wrong, courts should apply their own judgment." *Dion v. Sec'y of Health & Human Servs.*, 823 F.2d 669, 673 (1st Cir. 1987) (quoting *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94-95 (1973)).

"[T]he courts are the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 272 (1968) (citations and quotations omitted). The FEC was flat wrong about what the NVRA requires in terms of disclosure. The NVRA's plain text requires disclosure of "all records" concerning list maintenance activities, not just those included in Section 8(i)(2).

## II.    The District Court Correctly Held that the NVRA Preempts Exception J.

The Foundation challenges the following three restrictions and attached fines: (1) the prohibition on selling, transferring, or using the Voter File for "for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations," (A183-A184, ¶¶ 78-86) ("Use Ban"), (2) the prohibition on causing any identifying information to be made accessible by the

39

public, (A179, ¶ 50) ("Publication Ban"); (3) the prohibition on using the Voter

File to enforce the NVRA, (A179, ¶ 47) ("Enforcement Ban"); and, (4) the fines

imposed for violating those prohibitions, (A184-A185, ¶¶ 87-94) ("Fines").

The District Court held that the "Public Disclosure Provision's disclosure

mandate, meanwhile, does not allow a state to impose these restrictions" because

they "pose[] 'sufficient obstacle[s]' to the accomplishment and execution of

Congress's purposes," (Add. 013-014 (quoting *Me. Forest Prods. Council v.*

*Cormier*, 51 F.4th 1, 6 (1st Cir. 2022)), specifically, "Congress's purposes of

'protect[ing] the integrity of the electoral process' and 'ensur[ing] that accurate and

current voter registration rolls are maintained.'" (Add. 013 (quoting 52 U.S.C. §

20501(b)(3)-(4)).) The District Court's conclusion was the correct one and the

Secretary has offered no reason to disturb it.

### A. Preemption Under the Constitution's Election Clause.

In the words of the Supreme Court, the NVRA is a "a complex

superstructure of federal regulation atop state voter-registration systems." *Arizona*

*v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013) ("*Inter Tribal*"). The

multi-layered system in which the NVRA operates is permitted by the

Constitution's Elections Clause. U.S. Const. Art. I, § 4, cl. 1. Upon the States, the

Elections Clause "imposes the duty ('*shall* be prescribed') to prescribe the time,

40

place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Inter Tribal*, 570 U.S. at 8. The Elections "Clause's substantive scope is broad," and includes "regulations relating to 'registration.'" *Id*. at 8-9. Under the Elections Clause, there is no presumption against preemption. *Id*. at 14. Instead, Elections Clause legislation—like the NVRA—must be read "simply to mean what is says." "The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" *Inter Tribal*, 570 U.S. at 9 (*quoting Ex parte Siebold*, 100 U. S. 371, 392 (1880)). In *Inter Tribal*, the Supreme Court held that the NVRA is superior to any conflicting state laws. In such situations, "the state law, 'so far as the conflict extends, ceases to be operative.'" *Inter Tribal*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U. S. 371, 384 (1880)).

Federal preemption of state law "may be express or implied." *United States v. Machias Sav. Bank*, No. 1:21-mc-00320-LEW, 2022 U.S. Dist. LEXIS 2835, at *4 (D. Me. Jan. 6, 2022) (citations and quotations omitted). There are two types of implied preemption: "field preemption and conflict preemption, which itself comes

41

in two varieties: obstacle preemption and impossibility preemption." *Capron v. Office of the AG of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019). "Conflict preemption" occurs where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (citations and quotations omitted).

### B. Exception J and its Related Fines Are Preempted Because They Pose Obstacles to the Achievement of Congress's Objectives.

Because "the purpose of Congress is the ultimate touch-stone in every pre-emption case," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citations and quotations omitted), the Court must first consider the NVRA's purposes, which are the following:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)-(4). "To discern Congress' intent [the Court] examine[s] the explicit statutory language and the structure and purpose of the statute." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).

To help accomplish the NVRA's objectives, Congress required each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" due to death or relocation. 52 U.S.C. § 20507(a)(4). Congress also envisioned that states could permit removal for other reasons, such as felony convictions. 52 U.S.C. § 20507(a)(3)(B). Congress also provided a sweeping oversight mechanism, which gives the public the right to inspect "all" voter list maintenance records. 52 U.S.C. 20507(i)(1). As noted before, the Public Disclosure Provision does not promote transparency for the mere sake of transparency. Rather, it is a means to accomplish the NVRA's objectives—namely, accurate voter rolls and election integrity. 52 U.S.C. § 20501(b)(3)-(4).

The Fourth Circuit prudently observed that the Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote*, 682 F.3d at 334-35. The court recognized further that "[i]t is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Id*. at 339. In other words, Congress made voter list maintenance transparent so errors would be found and corrected. Congress also intended for the

public to "monitor" the voter rolls and evaluate officials' compliance with state and federal law. *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13.

More recently, the Middle District of Pennsylvania granted summary judgment on a public records claim while finding that "Congress struck such a balance when it enacted NVRA, deciding transparency in how states determine voter eligibility—the vital bedrock of our electoral system—is generally paramount." *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 307 (M.D. Pa. 2022).

Congress did not intend only for public oversight; Congress intended that the public would enforce the NVRA's mandates, as demonstrated by Congress's inclusion of a private-right-of-action provision in the NVRA, 52 U.S.C. § 20510(b). The Fifth Circuit has recognized that this component of the NVRA was meant to "encourage enforcement by so-called 'private attorneys general.'" *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 364 (5th Cir. 1999) (*quoting Bennett v. Spear*, 520 U.S. 154, 157 (1997)).

The Court must ask: Do Maine's use restrictions and fines make achieving the NVRA's purposes impossible or stand as obstacles to their fulfillment? The answer is "yes."

### 1. The Publication Ban.

#### a. The Publication Ban Poses Obstacles to the NVRA's Purposes.

Under Maine law, the Voter File's recipient may not:

Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

21-A M.R.S. § 196-A(1)(J)(2). Maine is penalizing those who find errors or mistakes by government officials from speaking about the mistakes and the basis for the conclusions. On its face, the NVRA does not prohibit publication of voter list maintenance data. In fact, in Section 8(i)(2) Congress made personally identifying information public—specifically, "names and addresses." 52 U.S.C. § 20507(i)(2). This makes sense because without personally identifying information one registrant cannot be distinguished from another. It is unreasonable to think that Congress would *require* the *public* disclosure of voter's names and addresses while tolerating the state's ability to punish—with crushing fines—the mere publication of that same information. What is reasonable—and what is consistent with the NVRA's purposes—is to conclude, as the District Court did, that Congress

45

believed public disclosure of names and addresses could be necessary to achieve

the statute's goals of making the work of election officials transparent.[6]

The Publication Ban is invalid primarily because it is a ban on speech that

violates the Constitution's First Amendment. U.S. Const. Amend. I. In fact, if the

Secretary wins here, not even the Press will be able to freely speak about the

contents of voter registration records.[7] The Secretary is flat wrong when she claims

the Publication Ban "merely prevents [an] organization[] from using [the Voter

---

[6] Imagine election officials refusing to process registration applications for students at a historically black college or university and refusing to provide the records that were part of the decision to deny voter registration. These were the facts in *Project Vote*. *See Project Vote*, 752 F. Supp. 2d at 699. It would nicely insulate government officials from criticism for sure but would certainly violate the NVRA. Imagine further a state law that prevented the maligned students from talking about the public records they obtained. That's what Exception J does.

[7] Consider the following: In 2022, news media reported that President Donald Trump's chief of staff Mark Meadows was allegedly registered to vote at a property that was not his legal residence. Bethea, *Why Did Mark Meadows Register to Vote at an Address Where He Did Not Reside?*, The New Yorker, March 6, 2022, https://www.newyorker.com/news/news-desk/why-did-mark-meadows-register-to-vote-at-an-address-where-he-did-not-reside (last accessed July 17, 2023). Subsequent reports alleged Mr. Meadows was registered to vote in three different states at the same time. Kessler, *Mark Meadows was simultaneously registered to vote in three states*, Washington Post, April 22, 2022, https://www.washingtonpost.com/politics/2022/04/22/mark-meadows-was-simultaneously-registered-vote-three-states/ (last accessed July 17, 2023). These reports were widely lauded. To be sure, the subject matter was newsworthy, for it concerned both politics and voter list maintenance. If a similar thing was discovered using Maine's Voter File, it would have been illegal to publish Mr. Meadows' name—or any name—in media reports.

Roll] for purposes inimical to the NVRA— posting voters' personal information to the internet or 'doxxing' voters based on unconfirmed suspicions of misconduct." (Brief at 54.) The Publication Ban prevents *all* publication, for any purpose, even publications that "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339.

The Publication Ban is also preempted because, as the District Court found, it is an obstacle to achieving at least NVRA purposes (3) and (4). Maine law facially prohibits the re-publication of information that Congress's has made public. "State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

The Publication Ban also conflicts with the Foundation's intended activities, namely, using the Voter File to educate the general public about Maine officials complying or not complying with their duties. (A211, ¶ 35.) The Foundation regularly issues reports to educate the public and government officials about voter list maintenance activity nationwide so that others may "monitor[] the state of the voter rolls and the adequacy of election officials' list maintenance programs." *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13. (A209-A210, ¶ 32.) These

47

reports occasionally include *public* records that contain information such as a last name or voter ID number. (A209-A210, ¶ 32, ¶ 34.)

The Publication Ban also conflicts with the Foundation's intention to use the Voter File to transmit apparent irregular registration and voting data to election officials throughout the country to help "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Those communications are subject to open records laws and by sending them the Foundation is "caus[ing] voter information … to be made accessible by the general public … through other means," in violation of current Maine law. 21-A M.R.S. § 196-A(1)(J)(2).

The Foundation's activities fit squarely within the NVRA's purposes. Because the Publication Ban obstructs the achievement of those purposes, it is preempted and invalid, as the District Court found.

### b. The Secretary's Defense of the Publication Ban Does Not Address the Dispositive Legal Issue and Fails to Identify Legal Error.

The Secretary's task on appeal is to sufficiently demonstrate that the Publication Ban does **not** obstruct the NVRA purposes, namely purpose (3), "protect[ing] the integrity of the electoral process," 52 U.S.C. § 20501(b)(3), and purpose (4), "ensur[ing] that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4). Yet the Secretary does not attempt those

arguments. Instead, the Secretary argues that Maine law "furthers" entirely different "objectives of Congress." (Brief at 47 (citing 52 U.S.C. § 20501(b)(2); *id*. at 49 ("The Publication Ban directly furthers the NVRA's core purpose of encouraging voter registration and enhancing participation in federal elections."); *id*. at 56 ("The Publication Ban is in harmony with federal privacy policies."); *id*. at 57 ("Exception J thus furthers the important federal policy of preventing voter intimidation.").

This is both flat wrong and, at best, an unmoored exaggeration about the intent of Congress. The First Circuit encountered a similar argument in *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1 (1st Cir. 2022), where the State of Maine fought preemption on the grounds that the challenged law was "complementary" to Congress's goals. *Id*. at 11. The Court rightfully rejected Maine's proxy justifications: "This claim will not wash." *Id*. "Even a state law that 'attempts to achieve one of the same goals as federal law' may be preempted when 'it involves a conflict in the method' of execution." *Id*.

In other words, whether Exception J actually furthers *other* Congressional objectives does not matter because no amount of good intentions can save a state law that plainly poses obstacles to Congress's explicitly articulated objectives. *Cormier*, 51 F.4th at 11. Put differently, it would not matter if Exception J could be

49

connected to a significant rise in voter registration (NVRA purpose (1), 52 U.S.C.

§ 20501(b)(1)), if it was an obstacle to achieving accurate and current voter

registration records (NVRA purpose (4), 52 U.S.C. § 20501(b)(4)). Indeed,

obstacle preemption considers the effect state law has on "the **full** purposes and

objectives of Congress." *Oneok, Inc.*, 575 U.S. at 377 (emphasis). Furthermore, to

find that Exception J may stand because it obstructs only *some* of the NVRA's

objectives would contravene the Supreme Court's admonition in *Husted v. A.*

*Philip Randolph Institute* to not allow one portion of the NVRA to "cannibalize"

another portion. 138 S. Ct. 1833, 1843 (2018).

The Secretary strays even further from the relevant inquiry when she

conjures imaginary monsters in an effort to stir fears. In this fable, the Secretary

includes (1) "publicly accus[ing] specific named voters of criminal activity" (Brief

at 49); (2) the "doxxing" of "ethnic and language minorities" (*Id.*); (3) criminal

voter intimidation (*id.* at 50); (4) "private groups level[ing] unsubstantiated public

allegations of misconduct at individual voters (*id.* at 55); (5) misuse by "scammers,

hackers, commercial interests, or foreign governments" (*id.* at 37). The Secretary

even invokes the activities of a different plaintiff in a completely different federal

action. (*Id.* at 50 (citing *Voter Reference Foundation, LLC v. Balderas*, 616 F.

Supp. 3d. 1132 (D.N.M. 2022)).) None of this is relevant to the question before

this Court because the Foundation does not allege an intention to engage in these activities.

More problematic for Maine, the Elections Clause does not tolerate restrictions on Congressional powers based on an upside down strict-scrutiny style analysis. Congress decides what must be disclosed, not state officials imagining scenarios where they get to replace the laws Congress passed with for compelling reasons they have invented. Nor does any of this change the fact that Exception J obstructs the NVRA's purposes.

The Secretary even resorts to personal attacks on the Foundation, threatening that if this Court affirms the judgment it will "give[] PILF the green light to lob public and unsubstantiated allegations of misconduct at individual Maine voters using data obtained from the CVR system." (Brief at 3-4.) Nonsense. The Secretary also inaccurately references unfounded and unproven accusations made against the Foundation by ideological opponents. (*See* Brief at 49.) That she is closely allied with these ideological opponents should not manifest itself in arguments before this Court. If the Secretary is suggesting that the Foundation, specifically, should be denied the benefit of federal rights, the Foundation may have a claim against the Secretary for viewpoint discrimination. America is a

country where government officials are not allowed to disregard the law when the law benefits those with whom government officials disagree.

Regardless, federal law already addresses the Secretary's proffered concerns. As she notes, there are plainly numerous laws aimed at combatting voter intimidation, all of which will survive Exception J's invalidation. (*See* Brief at 49, 56-57); *see also Doe v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring). In fact, Maine law separately and expansively prohibits the use of Voter Roll data to "engage in discrimination." 21-A M.R.S. § 196-A(4). The Foundation does not challenge these laws and, further, preemption applies only "so far as the conflict extends." *Ex parte Siebold*, 100 U.S. at 384. In short, the Secretary cannot rely on unchallenged aspects of Maine law to justify the aspects that pose clear obstacles to Congress's objectives.

Exemptions from facially valid disclosure laws are extremely rare and have been granted in only a few cases. For example, in *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958), petitioners "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." In *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 99 (1982), the challengers

"introduced proof of specific incidents of private and government hostility" including "threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office." In contrast, exemptions have been denied where a plaintiff presented "anecdotal evidence … that offers merely a speculative possibility of threats, harassment, or reprisals." *Doe v. Reed*, 823 F. Supp. 2d 1195, 1204 (W.D. Wash. 2011); *see also Protectmarriage.com v. Bowen*, 830 F. Supp. 2d 914, 933 (E.D. Cal. 2011) (requiring "evidence of thousands of acts of reprisals, threats or harassment" to obtain disclosure exemption). Where, as here, there is "no evidence" of threats or harassment, no exemption is warranted. *Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (discussing disclosure of First-Amendment protected campaign contributions).

The Secretary's defense of the Publication Ban rests entirely on speculation —that if the Foundation is allowed to educate the public and government officials about specific registration records and the failure of government officials to carry out their duties, the public at-large will refuse to participate in the electoral process. If what the Secretary argues was true, we would expect to see large-scale evidence of it nationwide, and specifically in Maine. Personally identifying information has already been publicly available under the NVRA since 1993, and

for nearly twenty years, Maine's political parties and others have been able to obtain personally identifying information and use it to make intrusive, at-home contact, with voters. *See* 21-A M.R.S. § 196-A(1)(B). Yet the Secretary does not offer a single instance where voter participation was discouraged.[8]

In fact, the opposite is true. "Maine's 2020 election turnout was among highest in US," according to reports.[9] And according to the Secretary herself, Maine's turnout in the 2022 election—which occurred after the passage of Exception J—was potentially the best in the nation.

> "Mainers should be so proud," Bellows said in an interview. "In 2020, we were third in the nation in voter participation. Given the high absentee ballot returns and the lines at polls today, we think we may on track to be first in the country."[10]

Neither history nor the record supports the Secretary's arguments.

The Secretary's position also cannot be squared with Maine's long-standing policy of publishing personally identifying information of campaign contributors

---

[8] Ohio and North Carolina publish their voter rolls directly on the Internet. *See* https://www6.ohiosos.gov/ords/f?p=111:1 (Ohio, last accessed July 18, 2023; https://www.ncsbe.gov/results-data/voter-registration-data (North Carolina, last accessed July 18, 2023). Yet there is no widespread intimidation or disenfranchisement in those states either.

[9] https://bangordailynews.com/2020/11/25/politics/maines-2020-election-turnout-was-among-highest-in-us/ (last accessed July 18, 2023).

[10] https://www.mainepublic.org/politics/2022-11-08/maine-voter-turnout-is-very-high-on-election-day-says-secretary-of-state (last accessed July 18, 2023).

on the Internet. Individuals who contribute as little as $10 to a candidate must provide the campaign with their name and address.[11] Individuals giving more than $50 must also provide their occupation and employer.[12] With a few clicks, anyone in the world can download a report containing this personally information for thousands of Mainers directly from the Maine government. https://mainecampaignfinance.com/index.html#/dataDownload (last accessed July 18, 2023). These reports remain published for as long as 15 years, well after their informational value has expired. Maine's concerns about privacy and intimidation cannot be taken seriously.

Yet the Court need not evaluate the Secretary's sincerity to affirm the judgment because Congress, not the Secretary, determines federal policy. On that point, the Fourth Circuit's reasoning is particularly apt:

> It is not the province of this court, however, to strike the proper balance between transparency and voter privacy. That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1), which plainly requires disclosure of completed voter registration applications.

*Project Vote*, 682 F.3d at 339-40.

---

[11] https://www.maine.gov/ethics/political-activity/contributing-information (last accessed July 18, 2023.)

[12] *Id*.

### 2. The Use and Enforcement Bans.

### a. Exception J's Plain Language Refers to Maine Only.

Exception J prohibits under financial penalty the use of the Voter File "for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations[.]" 21-A M.R.S. § 196-A(J)(1). The District Court found that under a plain reading of the statutory language, Exception J "would prohibit an organization such as Plaintiff from using the Voter File to evaluate *another* state's compliance with its voter list maintenance obligations[.]" (Add. 012 (emphasis in original).) And while the Court found Exception J could be read to permit NVRA enforcement actions against *Maine* (Add. 013 n.18), the same is not true for enforcement actions against *other states*: "Exception J as written would prohibit using the Voter File to enforce the NVRA when the basis for such action was the evaluation (via Maine's Voter File) of *another* state's voter list maintenance obligations." (*Id.*)

As interpreted below, the validity of the Use and Enforcement Bans is determined by the same question: Does Exception J's plain language refer to Maine or all states? As the District Court found, the answer is "Maine."

"Maine's basic rules of statutory interpretation require that words in a statute be given 'their plain, common, and ordinary meaning.'" *Palmieri v. Nynex Long*

56

*Distance Co.*, 437 F.3d 111, 116 (1st Cir. 2006) (quoting *Butterfield v. Norfolk &*

*Dedham Mut. Fire Ins. Co.*, 2004 ME 124, 860 A.2d 861, 862 (Me. 2004)). The

Maine legislature did not say "states." The legislature used the singular "state."

The legislature did not say "a" state or "any" state but said "the" state. The word

"State" is also capitalized, which connotes uniqueness. The legislature also chose

to capitalize the term "Secretary of State," which unquestionably refers to Maine's

Secretary of State. Generally speaking, Section 196-A addresses access and use of

data related to Maine's registered voters. All of this points to one thing: when the

legislature wrote "the State," it meant Maine and only Maine.

The legislative intent is so abundantly clear that the Secretary agreed with

this interpretation in her Motion to Dismiss briefing below.

> Similarly, PILF contends that it may wish to use Maine's voter data not
> just to evaluate Maine's compliance with § 8, but other states'
> compliance. *Id*. ¶ 46. There is no reason to think, however, that
> Congress had such purposes in mind in enacting § 8(i). Rather,
> Congress almost certainly intended to require each state to provide
> information about *its own* list maintenance activities, not other states'
> activities.

(ECF No. 58 at 20.) Perhaps realizing the unavoidable conflict with the NVRA, the

Secretary has changed her mind. She cannot, however, change the statute's text,

which plainly limits the Voter File's use to evaluation of "the State" of Maine.

To support her new view of the legislature's intent, the Secretary offers nothing more than a citation to "Maine's equivalent of the Dictionary Act." (Brief at 60 (citing 1 M.R.S.A. § 72(21).) The Act, she claims, "confirms that a statute's reference to 'State' does not necessarily mean Maine specifically." (*Id*.) The Dictionary Act does no such thing. The Act provides, "'State,' used with reference to any organized portion of the United States, may mean a territory or the District of Columbia." 1 M.R.S.A. § 72(21). This means that "state" sometimes includes territories and the District of Columbia. It does not mean that "state" always means *any* state, and much less that the legislature intended for "the State" in Exception J to mean all states.

The Dictionary Act cannot change the fact that in this instance, the legislature chose the phrase "the State." The text, context, and subject matter of the statute all support the conclusion that the legislature intended to refer to one state: Maine. The District Court agreed, noting, "[I]f the Maine legislature intended to permit the use of the Voter File for the purpose of evaluating *another* state's voter list maintenance, it could have easily indicated as much in the statutory language." (Add. 013 n.18.) The District Court also recognized that "a comparison of Exception J to other portions of the election statute supports this Court's conclusion that 'the State' refers to Maine specifically." (*Id*.)

58

By its text, Maine law prohibits the Foundation (and all other persons) from using the Voter File to evaluate legal compliance, identify list maintenance errors (and perhaps fraud) in all other states, and enforce the NVRA in other states (using the Voter File). As the District Court found, Exception J is thus an "obstacle" to Congress's objectives, it is therefore preempted and invalid.[13]

### b. The Foundation Has Standing to Challenge the Use and Enforcement Bans.

The District Court correctly held that the Foundation has standing to challenge the Use and Enforcement Bans because the Foundation's planned "conduct would contravene Maine law." (Add. 014-015) The Secretary maintains that the Foundation lacks standing because "both the Secretary of State and the Attorney General have expressly and unequivocally disclaimed any intent to enforce Exception J in the manner that PILF claims to fear." (Brief at 61.)

A point of clarification is first required. The statements the Secretary refers to were not made by the Secretary, but by Deputy Secretary of State Julie Flynn. (*See* A295-A297, ¶¶ 13-23.) The Secretary, not her Deputy, is Maine's chief

---

[13] The Secretary's entire defense of the Use and Enforcement Bans rests on its argument that Exception J permits cross-state evaluation and enforcement. The Secretary does <u>not</u> contest the District Court's conclusion that Exception J is preempted if interpreted to prohibit those activities. For that reason, the Foundation has not repeated here its full arguments for why Exception J fails the obstacle preemption analysis. (*See* ECF No. 74 at 9-13; ECF No. 84 at 4-8.)

election official and "the coordinator of state responsibilities under the National Voter Registration Act of 1993." 21-A M.R.S. § 180. The Secretary, not her Deputy, is the named defendant in this action.

While Deputy Secretary Flynn claims that the Secretary "agrees with these interpretations and has authorized me to convey them to the Court," such a statement is not a valid substitute for the Secretary's testimony. The Secretary had every opportunity to submit her own sworn statements and chose not to. She must now live with her choices. Convenience is not a valid reason to dispense with evidentiary rules. Indeed, it is not hard to envision the problems that would arise if witnesses could offer testimony vicariously.

The same goes for the Attorney General. He had every opportunity to put his own sworn statements into the record. He chose instead to offer them through his staff in a reply brief. The Attorney General's office also had every opportunity to bind itself through a court-approved settlement or consent decree. It chose not to. The Attorney General must also live with his choices.

The District Court agreed that Deputy Secretary Flynn's promises do not have the force of law and are not binding on the current Secretary or future office holders. (Add. 015-016.) In other words, the current or future Secretary and Attorney General are free to change their minds and enforce the law as written at

any time. (Add. 015 n.21 ("[E]ven an attorney general's non-binding promise not to prosecute does not eliminate plaintiffs' standing because the Attorney General or his successors might change their mind." (citations and quotations omitted)).) This risk is even more severe in these circumstances where the Secretary has simply adopted a litigation position contrary to the statute's text in an obvious attempt to defeat the Foundation's standing.

The Secretary's actions are not unlike a defendant who attempts to moot a case by ceasing her allegedly unlawful conduct after the conduct is challenged in court. In such cases, "a defendant's voluntary change in conduct moots a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 47 (1st Cir. 2022) (citations omitted). As her about-face on the Use Ban demonstrates, the Secretary is willing to quickly change her interpretation of Exception J depending on the circumstances. It is not "absolutely clear" that she will not do so again.

Absent a resolution that bears sufficient judicial imprimatur or is otherwise enforceable, the Foundation continues to face a real and imminent threat of harm sufficient to challenge the Enforcement Ban and the Use Ban.

### 3.  The Fines Are Preempted.

Because each of the challenged restrictions is preempted and unenforceable, the Fines must necessarily be too. Maine may not punish what Congress allows here. It is axiomatic that monetary penalties deter conduct—indeed, it is their purpose—and they are thus plainly an obstacle to Congress's goals. This Court should also find the Fines preempted.

## <u>CONCLUSION</u>

Maine has muzzled criticism of government officials by acting contrary to legal norms centuries old in the United States—by shielding public records and imposing fines on anyone who would speak about what they show. That is outlandish, and the District Court faithfully interpreted and applied the NVRA's plain language. Exception J contravenes the NVRA, and it cannot stand as written. For these reasons, this Court should affirm the judgment below.

Dated: July 19, 2023.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:

    /s/ Noel H. Johnson

Noel H. Johnson (Wis. Bar # 1068004)
Kaylan L. Phillips (In. Bar #30405-84)
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street, Suite 700
Alexandria, VA 22314
Phone: 703-745-5870
njohnson@PublicInterestLegal.org
kphillips@PublicInterestLegal.org

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Because this appeal presents issues concerning the right to vote, Appellee

Public Interest Legal Foundation respectfully requests oral argument.

Dated: July 19, 2023.

  /s/ Noel H. Johnson    
Noel H. Johnson
*Counsel for Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits of Rule 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 12,997 words.

This brief also complies with the typeface requirements because this brief has been prepared in a proportionally space type face using Microsoft Word in 14 point Times New Roman.

Dated: July 19, 2023.

  /s/ Noel H. Johnson   

Noel H. Johnson

*Counsel for Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, I electronically filed the foregoing

using the Court's ECF system, which will serve notice on all parties.

 /s/ Noel. H Johnson
Noel H. Johnson
njohnson@publicinterestlegal.org