No. 23-1361

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

PUBLIC INTEREST LEGAL FOUNDATION,

Plaintiff-Appellee

v.

SHENNA BELLOWS, in her official capacity as the
Secretary of State for the State of Maine,

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

# BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE URGING CERTIFICATION OR AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN

KRISTEN CLARKE
Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 598-0243

## TABLE OF CONTENTS

PAGE

INTEREST OF THE UNITED STATES ........................................................... 1

STATEMENT OF THE ISSUES ................................................................... 2

STATEMENT OF THE CASE ...................................................................... 2

*1. Statutory Background* ........................................................................ 2

*2. The Present Controversy* ................................................................... 4

SUMMARY OF ARGUMENT ...................................................................... 6

ARGUMENT

I THE NVRA REQUIRES THE SECRETARY TO DISCLOSE THE VOTER FILE ........................................................ 7

*A. Section 8(i) Covers States' Voter Lists* ...................................... 7

*B. The Secretary's Attempts To Limit 8(i)'s Scope Fail* ............... 14

II THIS COURT SHOULD CERTIFY THE QUESTION OF EXCEPTION J'S SCOPE TO THE MAINE SUPREME JUDICIAL COURT ....................................................... 18

III IF THE DISTRICT COURT CORRECTLY INTERPRETED THE USE AND DISSEMINATION BANS, THE NVRA PARTIALLY PREEMPTS THEM .................................................. 21

*A. As Interpreted By The District Court, The Use And Dissemination Bans Pose Obstacles To Fulfilling The NVRA's Purposes And Therefore Are Preempted To The Extent Of The Conflict* ................................................ 21

**TABLE OF CONTENTS (continued):** **PAGE**

*B. NVRA Preemption Does Not Prohibit Redaction Of Sensitive Voter Information Or Enforcement Of Other Laws Prohibiting The Misuse Of Personal Data* .......... 27

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITES

**CASES:** **PAGE**

*Arizonans for Off. Eng.* v. *Arizona*, 520 U.S. 43 (1997) .................................. 19-20

*Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .................... 22, 27

*Arizona* v. *Thompson*, 281 F.3d 248 (D.C. Cir. 2002) ..........................................15

*Baker* v. *Smith & Wesson, Inc.*, 40 F.4th 43 (1st Cir. 2022) ..................................16

*Biden* v. *Texas*, 142 S. Ct. 2528 (2022) ................................................................15

*Boos* v. *Barry*, 485 U.S. 312 (1988) .......................................................................19

*Brown* v. *Crown Equip. Corp.*, 501 F.3d 75 (1st Cir. 2007),
certified question answered, 960 A.2d 1188 (Me. 2008) ..............................21

*Colón-Marrero* v. *Vélez*, 813 F.3d 1 (1st Cir. 2016) ..........................................7, 11

*Del Grosso* v. *Surface Transp. Bd.*, 898 F.3d 139 (1st Cir. 2018) ..........................16

*Felder* v. *Casey*, 487 U.S. 131 (1988) .....................................................................23

*Fish* v. *Kobach*, 840 F.3d 710 (10th Cir. 2016).......................................................22

*Franchini* v. *Investor's Bus. Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020).......................20

*Goncalves Pontes* v. *Barr*, 938 F.3d 1 (1st Cir. 2019) ...........................................18

*Johnson* v. *City of Saline*, 151 F.3d 564 (6th Cir. 1998) .......................................15

*Maine Forest Prods. Council* v. *Cormier*,
51 F.4th 1 (1st Cir. 2022).....................................................................21-22, 24-25

*Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc.* v.
*Emanuelli Hernandez*, 58 F.4th 5 (1st Cir. 2023) ................................. 23, 28

**CASES (continued):** **PAGE**

*Mount Vernon Fire Ins. Co.* v. *VisionAid, Inc.*,
875 F.3d 716 (1st Cir. 2017)....................................................................19

*NCTA - The Internet & Television Ass'n* v. *Frey*,
7 F.4th 1 (1st Cir. 2021) .........................................................................19

*Patel* v. *Garland*, 142 S. Ct. 1614 (2022)...............................................................10

*Penobscot Nation* v. *Frey*, 3 F.4th 484 (1st Cir. 2021) (en banc)
cert. denied, 142 S. Ct. 1668 and 142 S. Ct. 1669 (2022)............................13

*Project Vote/Voting for Am., Inc.* v. *Long*, 682 F.3d 331 (4th Cir. 2012)....... *passim*

*Public Int. Legal Found., Inc.* v. *North Carolina State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ................................................................ 11, 28

*United States* v. *Councilman*, 418 F.3d 67 (1st Cir. 2005) (en banc).....................11

*United States* v. *Dion*, 37 F.4th 31 (1st Cir.),
cert. denied, 143 S. Ct. 387 (2022).................................................. 10-11, 16

*United States* v. *Mead Corp.*, 533 U.S. 218 (2001)......................................... 17-18

*United States* v. *Saemisch*, 70 F.4th 1 (1st Cir. 2023) ..........................................12

**STATUTES:**

Help America Vote Act
52 U.S.C. 21083.........................................................................................8
52 U.S.C. 21083(a)(1)(A)........................................................................3, 10
52 U.S.C. 21083(a)(2)(B).............................................................................9
52 U.S.C. 21083(a)(4) ..............................................................................4, 9
52 U.S.C. 21083(a)(5)(B)........................................................................4, 10
Pub. L. No. 107-252, 116 Stat. 1666 (2002) ..........................................3, 17

National Voter Registration Act
52 U.S.C. 20501(a)................................................................................... 2-3
52 U.S.C. 20501(b)............................................................................... 13, 23

**STATUTES (continued):** **PAGE**


52 U.S.C. 20501(b)(4) ....................13
52 U.S.C. 20504(c)(2) ....................9-10
52 U.S.C. 20504(e) ....................13
52 U.S.C. 20504-20506 ....................8-9
52 U.S.C. 20506(d) ....................13
52 U.S.C. 20507 ....................3
52 U.S.C. 20507(a) ....................8, 12
52 U.S.C. 20507(a)(1) ....................12-13
52 U.S.C. 20507(a)(4) ....................9, 12, 15-16
52 U.S.C. 20507(a)(5)(A) ....................12
52 U.S.C. 20507(b) ....................8, 28
52 U.S.C. 20507(b)(1) ....................12-13
52 U.S.C. 20507(c) ....................8
52 U.S.C. 20507(c)(2) ....................12, 15
52 U.S.C. 20507(d) ....................8, 15
52 U.S.C. 20507(f) ....................8, 15
52 U.S.C. 20507(g) ....................8
52 U.S.C. 20507(i) .................... *passim*
52 U.S.C. 20507(i)(1) .................... *passim*
52 U.S.C. 20507(i)(2) ....................16
52 U.S.C. 20508(a) ....................17
52 U.S.C. 20508(b)(1) ....................9-10
52 U.S.C. 20508(b)(2) ....................9-10
52 U.S.C. 20510(a) ....................1
52 U.S.C. 20510(b) ....................23
52 U.S.C. 20510(b)(1) ....................26
52 U.S.C. 20511(1) ....................29
Pub. L. No. 103-31, 107 Stat. 77 (1993) ....................2, 17

5 U.S.C. 552(b)(6) ....................25

5 U.S.C. 552a(b) ....................25

18 U.S.C. 594 ....................29

52 U.S.C. 10307(b) ....................29

52 U.S.C. 10308(d) ....................29

**STATUTES (continued): PAGE**

52 U.S.C. 20703 ..........25

52 U.S.C. 20704 ..........25

Me. Stat. Tit. 21-A, § 128 (2023) ..........8

Me. Stat. Tit. 21-A, § 161 (2023) ..........8

Me. Stat. Tit. 21-A, § 162-A (2023) ..........8

Me. Stat. Tit. 21-A, § 196-A(1)(J) (2023) .......... *passim*

Me. Stat. Tit. 21-A, § 232 (2023) ..........8

Me. Stat. Tit. 21-A, § 233 (2023) ..........8

**RULE:**

Me. R. App. P. 25(a) ..........20

**LEGISLATIVE HISTORY:**

S. Rep. No. 6, 103rd Cong., 1st Sess. (1993) .......... 16, 23-24

*Voter Registration: Hearing Held Before the Subcomm. on Elections of the H. Comm. on Admin.*, 103rd Cong., 1st Sess. (1993) ..........24

**MISCELLANEOUS:**

National Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/Z5UL-LPBY ..........17

Theodore Z. Wyman, *Litigation of Voter Intimidation Law*, 174 Am. Jur. Trials 385 (May 2023) ..........29

**MISCELLANEOUS (continued):** **PAGE**

*Webster's Third New International Dictionary* (1993) ............................................8

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

No. 23-1361

PUBLIC INTEREST LEGAL FOUNDATION,

Plaintiff-Appellee

v.

SHENNA BELLOWS, in her official capacity as the
Secretary of State for the State of Maine,

Defendant-Appellant

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

---

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE URGING CERTIFICATION OR AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN

---

## INTEREST OF THE UNITED STATES

This case raises important issues regarding Section 8(i) of the National Voter Registration Act (NVRA), 52 U.S.C. 20507(i). The Attorney General is charged with enforcing the NVRA. 52 U.S.C. 20510(a). Accordingly, the United States has an interest in ensuring that Section 8(i) is correctly construed and given its proper preemptive scope. The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

The United States addresses the following issues:

1. Whether Section 8(i) requires disclosure of Maine's voter registration database.

2. Whether the Court should certify to the Maine Supreme Judicial Court the question of how to interpret Maine's statutory restrictions on using and disseminating voter data.

3. If the Court declines to certify, whether Section 8(i) preempts Maine's use and dissemination restrictions to the extent they interfere with the NVRA's purposes.

4. Whether the NVRA leaves States and individuals free to protect voter privacy by redacting sensitive information from released voter records or enforcing other laws prohibiting misuse of personal information.[1]

## STATEMENT OF THE CASE

*1. Statutory Background*

a. In 1993, Congress passed the NVRA, Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. 20501-20511). Congress found that governments have a "duty" to promote the "fundamental right" to vote, and that "discriminatory and unfair registration laws and procedures" can damage federal voter participation and

---

[1] The United States takes no position on any issue not addressed herein.

"disproportionately harm" participation "by various groups, including racial minorities." 52 U.S.C. 20501(a).

Section 8 of the NVRA, titled "[r]equirements with respect to administration of voter registration," establishes uniform procedures to increase voter registration in federal elections while maintaining accurate voter rolls. See 52 U.S.C. 20507. This case concerns Section 8(i), titled "[p]ublic disclosure of voter registration activities." 52 U.S.C. 20507(i). Section 8(i) provides, in relevant part:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. 20507(i)(1).

b. In 2002, Congress enacted the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (52 U.S.C. 20901-21145). HAVA required each State to create "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A) and (a)(1)(A)(i). Upon receiving registration applications, election officials must "electronically enter[]" the information "into the computerized list on an expedited basis." 52 U.S.C. 21083(a)(1)(A)(vi). States must take specified

steps to ensure that officials can "verify the accuracy of the information provided on applications for voter registration," and must "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. 21083(a)(4) and (a)(5)(B)(i).

*2. The Present Controversy*

a. As HAVA requires, Maine maintains its voter-roll information in a single database. Doc. 87, at 4.[2] Plaintiff Public Interest Legal Foundation (PILF), a nonprofit "that 'seeks to promote the integrity of elections nationwide,'" sent Maine Secretary of State Shenna Bellows (the Secretary) a request in October 2019 for "an electronic copy of Maine's 'statewide voter registration list.'" Doc. 87, at 3, 5 (citations omitted). A state law restricting access to the State's voter list prohibited the Secretary from releasing this data. Doc. 87, at 5. PILF sued the Secretary under the NVRA. Doc. 87, at 5.

b. In June 2021, Maine added a new Exception J to its confidentiality law. Doc. 87, at 5. Exception J allows anyone "evaluating the State's compliance with its voter list maintenance obligations" to "purchase" a subset of information—the Voter File—from the statewide database. Me. Stat. Tit. 21-A, § 196-A(1)(J) (2023). However, those obtaining the Voter File must comply with two privacy

---

[2] "Doc. __, at __" refers to the docket entry and page number of documents filed in the district court, No. 1:20-cv-61 (D. Me.). "Sec'y Br." and "PILF Br." refer respectively to the Secretary's and PILF's opening briefs on appeal.

restrictions. First, the Use Ban states that they may not "use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations." *Id.* § 196-A(1)(J)(1). Second, the Dissemination Ban states that they may not cause "any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means." *Id.* § 196-A(1)(J)(2).

c. After Maine enacted Exception J, PILF amended its complaint. Doc. 55. The Secretary moved to dismiss. Doc. 58. The district court denied the motion in relevant part, holding that Section 8(i) required the State to disclose the Voter File and that PILF plausibly alleged its preemption claims. Doc. 61, at 9-12.

Both sides later moved for summary judgment (Docs. 74, 80), and the court granted PILF's motion (Docs. 87, 88). It first refused the Secretary's request to reconsider its holding that Section 8(i) mandates the Voter File's disclosure. Doc. 87, at 7 & n.10, 10-11. It then found that the plain language of Maine's Exception J would forbid PILF from (1) using the Voter File "to evaluate *another* State's compliance with its voter list maintenance obligations," (2) "enforc[ing] the NVRA" against other States, and (3) "publicly releasing the Voter File's data." Doc. 87, at 11-12 & nn.17-18. Finally, the court held that Exception J poses a

sufficient obstacle to the accomplishment of the NVRA's purposes to warrant preemption. Doc. 87, at 12-13. It issued a declaratory judgment. Doc. 87, at 17.

d. The Secretary timely appealed. Doc. 89.

## SUMMARY OF ARGUMENT

The district court correctly held that Section 8(i) requires the Secretary to disclose the Voter File. Statutory text, context, and purpose establish that Section 8(i) covers records concerning both voter registration and list-maintenance activities, including voter registration lists such as the Voter File. The Secretary's reliance on select provisions of Section 8 and statements from the Federal Election Commission (FEC) do not support her contrary argument.

Before resolving the subsequent preemption question, this Court should certify the question of Exception J's scope to the Maine Supreme Judicial Court. The parties hotly debate the Use Ban's breadth, and questions remain about the Dissemination Ban's scope. Maine's highest court alone can issue binding interpretations of state law, and it may provide narrowing constructions that obviate some or all of the preemption issues in this case.

Should this Court decline to certify, then the NVRA would partially preempt both the Use and Dissemination Bans as the district court interpreted them. The NVRA preempts any condition on Section 8(i)'s disclosure right—including restrictions on using and disseminating voter data—when it would interfere with

the statute's purposes. For similar reasons, Section 8(i) can be viewed as creating implied federal rights to use or disseminate the records it requires to be disclosed, when needed to fulfill the NVRA's purposes. As interpreted by the district court, Maine's broad bans pose obstacles to fulfilling the NVRA's purposes and are preempted as to applications that conflict with those purposes.

However, Maine retains many options to protect voters' privacy, which the NVRA does not preempt or hinder. For instance, States may redact certain particularly sensitive information before disclosing voters' records. Likewise, they may prohibit use or dissemination of voter data that does not further the NVRA's purposes. And the NVRA leaves intact many state and federal laws designed to prevent voter intimidation or other abuses.

## ARGUMENT

## I

## THE NVRA REQUIRES THE SECRETARY TO DISCLOSE THE VOTER FILE

### *A. Section 8(i) Covers States' Voter Lists*

The district court correctly held that Section 8(i) applies to voter registration databases like the Voter File. The NVRA's language, structure, and purpose support this reading.

1. The "starting point in discerning the meaning of a statute is the provision itself." *Colón-Marrero* v. *Vélez*, 813 F.3d 1, 11 (1st Cir. 2016). Section 8(i)

requires disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Maine's Voter File, which records the results of all the State's registration and list-maintenance activities, falls squarely within this language. To see why, take each piece of the statutory text step by step.

First, both Maine's registration and list-maintenance efforts plainly constitute "programs" or "activities." 52 U.S.C. 20507(i)(1). A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation." *Webster's Third New International Dictionary* 22, 1812 (1993). Maine's efforts meet either definition. Both federal and state law require Maine to make ongoing, continuous efforts to verify applicants' eligibility to vote, register eligible voters in its central voter registration system, revise its voter registration records, and remove ineligible voters from its voter rolls. See 52 U.S.C. 20504-20506, 20507(a)-(g), 21083; Me. Stat. Tit. 21-A, §§ 128, 161, 162-A, 232, 233 (2023). Each of these processes "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end—maintenance of voter rolls." *Project Vote/Voting for Am., Inc.* v. *Long*, 682 F.3d 331, 335 (4th Cir. 2012) (*Project*

*Vote*). And each "is an 'activity' because it is a particular task and deed of [Maine] election employees," a normal operation for which they are responsible. *Ibid.*

Next, these registration, maintenance, and removal activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Maine's after-the-fact list-maintenance activities plainly ensure that the voter rolls remain both current and accurate as voters move, die, changes their names, or affiliate with new political parties. See also 52 U.S.C. 20507(a)(4) and (b)-(g), 21083(a)(2)(B) and (a)(4) (requiring States, under both the NVRA and HAVA, to conduct continuous list maintenance activities while imposing safeguards to prevent improper removals). But registration processes also serve this purpose, as "voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." *Project Vote*, 682 F.3d at 335.

Meeting these goals is not a mere byproduct of the registration process (contra Sec'y Br. 33); application review and database input processes have no other purpose but to ensure that the voter rolls as a whole remain correct and up-to-date. Congress acknowledged as much in the NVRA itself: It instituted several new mandatory voter registration methods, 52 U.S.C. 20504-20506, and required voter registration forms to ask for the information (but only the information) needed to enable officials to "assess the eligibility of the applicant," 52 U.S.C.

20504(c)(2)(B)(ii), 20504(c)(2)(C), and 20508(b)(1)-(2). And Congress further emphasized these purposes in passing HAVA: It required all States to develop statewide electronic voter databases, and mandated that election officials "verify the accuracy" of applicants' information and enter voters' information into the statewide list "on an expedited basis," so that States would always have an accurate and up-to-date list. 52 U.S.C. 21083(a)(1)(A)(vi) and (a)(5)(B)(i).

Moreover, the information in the Voter File constitutes "records concerning the implementation of" Maine's registration and list-maintenance programs. 52 U.S.C. 20507(i)(1). Section 8(i) extends not just to records "*of*" the implementation of programs or activities, but rather to all records "concerning" implementation. *Ibid.* (emphasis added). Like its synonym "regarding," the word "concerning" used "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel* v. *Garland*, 142 S. Ct. 1614, 1622 (2022) (citation omitted). The Voter File reflects the results of Maine's registration and list-maintenance activities, and therefore "concern[s]"—or relates to—the "implementation" of those activities. *Project Vote*, 682 F.3d at 335. Moreover, the NVRA applies its disclosure requirement to "*all*" such "records." 52 U.S.C. 20507(i)(1) (emphasis added). "All," like the similar word "any," gives a provision "an expansive meaning," covering implementation-related records "of whatever kind." *United*

*States* v. *Dion*, 37 F.4th 31, 35 (1st Cir.), cert. denied, 143 S. Ct. 387 (2022). "[T]he statute's use of the term 'all records' relating to [a State's] 'implementation of' the program or activity" indicates that Section 8(i) "encompasses a broad range of disclosable documents." *Public Int. Legal Found., Inc.* v. *North Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021). This includes the Voter File.

Finally, the Voter File is not among the two sets of records excluded from Section 8(i)'s reach: those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. 20507(i)(1). As "Congress explicitly enumerate[d] certain exceptions" to Section 8(i), the Secretary cannot invent any "additional," "implied" exceptions for registration databases. *United States* v. *Councilman*, 418 F.3d 67, 75 (1st Cir. 2005) (en banc) (citation omitted). That Congress needed to exclude two types of records, both of which relate to voter registration, also confirms that Section 8(i) otherwise reaches registration records.

2. A "contextual review" further shows that Section 8(i) requires disclosure of the Voter File. *Colón-Marrero*, 813 F.3d at 12. Section 8(i) is captioned "Public disclosure of voter *registration* activities," 52 U.S.C. 20507(i) (emphasis added), and falls within a section titled "[r]equirements with respect to administration of voter *registration*," 52 U.S.C. 20507 (emphasis added). "These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter

registration records," *Project Vote*, 682 F.3d at 337, including records of who is registered.

Congress also specified throughout Section 8 when its provisions applied solely to list maintenace. For instance, Section 8(c), titled "[v]oter removal programs," sets time limits for completing "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This language refers only to large-scale list-maintenance programs. Section 8(a)(4) is even more explicit, requiring States to implement a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" voters' death or change of address. 52 U.S.C. 20507(a)(4). Section 8(i) contains no such language—a presumptively intentional difference. See *United States* v. *Saemisch*, 70 F.4th 1, 10 (1st Cir. 2023).

By contrast, Section 8(a)—like Section 8(i)—regulates registration as well as list-maintenance activities. 52 U.S.C. 20507(a); see 52 U.S.C. 20507(a)(1) and (a)(5)(A) (mandating measures to "inform applicants" of "voter eligibility requirements" and "ensure that any eligible applicant is registered to vote"). And in Section 8(b), Congress set standards for "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office." 52

U.S.C. 20507(b)(1). This language, like Section 8(i)'s, applies across-the-board to activities designed to "ensur[e] the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Such activities include adding eligible applicants to the lists and leaving off ineligible applicants.

3. To the extent any textual "ambiguity" remains, statutory purpose can "resolve" it. *Penobscot Nation* v. *Frey*, 3 F.4th 484, 498 (1st Cir. 2021) (en banc), cert. denied, 142 S. Ct. 1668 and 142 S. Ct. 1669 (2022). Disclosure of the Voter File plainly would advance all of the NVRA's purposes: increasing eligible voter registration, enhancing voter participation, protecting electoral integrity, and maintaining accurate and current voter registration rolls. See 52 U.S.C. 20501(b). Whether "voter registration rolls" are "accurate and current," 52 U.S.C. 20501(b)(4), cannot be determined without actually examining them. Public inspection of the information included in the Voter File, both alone and combined with other records, can help ensure that States are properly evaluating applications, rejecting applicants only for legitimate reasons, processing eligible applications in a timely fashion, and engaging in uniform and nondiscriminatory registration and list-maintenance practices. See, *e.g.*, 52 U.S.C. 20504(e); 52 U.S.C. 20506(d); 52 U.S.C. 20507(a)(1) and (b)(1). Inspection of such records also may help uncover systemic problems in a jurisdiction, so voters or organizations can remedy registration and list-maintenance issues before future elections. See, *e.g.*, *Project*

*Vote*, 682 F.3d at 333. Public disclosure of the Voter File thus advances the NVRA's central purposes.

*B. The Secretary's Attempts To Limit 8(i)'s Scope Fail*

1. The Secretary responds (Br. 27, 33) that Section 8(i) applies only to list-maintenance programs—and even then, only to records that directly "describe" or "document" these programs (Br. 30). As discussed above, however, neither text, context, nor purpose supports this distinction between voter-registration and list-maintenance activities, or so strictly limits the records covered. In any event, the two categories cannot be so neatly separated. As the Secretary herself acknowledges (Br. 12), some of the data in the Voter File—like voter participation history, or updates to voters' addresses—"is not derived from" voters' initial registration forms, but rather from later list-maintenance. The Voter File therefore is a record concerning the implementation of both registration *and* list-maintenance activities.

2. The Secretary at times goes further and claims (Br. 27, 29-31, 33-34, 43-44) that Section 8(i) does not even apply to States' ongoing, "day-to-day" list-maintenance processes. Rather, she asserts (Br. 27), Section 8(i) reaches only the purposeful, periodic list-maintenance programs "authorized and regulated by the remainder of § 8."

But Section 8(i)'s text cannot be read to tether disclosure to those programs alone. "If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden* v. *Texas*, 142 S. Ct. 2528, 2539 (2022). It could have limited disclosure to records of "list-maintenance programs described in this section." Or it could have employed language like that in other provisions of Section 8, which limit themselves to the removal of names or other particular list-maintenance processes. *E.g.*, 52 U.S.C. 20507(a)(4), (c)(2), (d) and (f). But Section 8(i) uses general language, applying to *all* records concerning implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Section 8(i) also reaches "activities," *ibid.*, a word that "suggests great breadth," *Johnson* v. *City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998), and plainly covers "administrative functions" like "the maintenance of databases," *Arizona* v. *Thompson*, 281 F.3d 248, 257 (D.C. Cir. 2002).

3. Lastly, the Secretary asserts (Br. 38-41) that Congress did not have the Voter File in mind when it crafted Section 8(i). She notes (Br. 39), for instance, that some provisions in Section 8 mention voter lists, but that Section 8(i) does not specify that such lists are disclosable. Congress, however, chose to draft a general provision that covers "all" records concerning implementation of relevant programs or activities. "This commodious phrasing leaves no doubt that Congress

did not intend to exclude particular kinds of [records] simply because they were left unmentioned." *Dion*, 37 F.4th at 36.

The Secretary also relies (Br. 40-41) on Section 8(i)(2). This paragraph specifies that States must maintain certain records about confirmation-of-address mailings sent as part of Section 8(a)(4) programs, but it does not mention voter registration databases (or any other records). 52 U.S.C. 20507(i)(2). The Secretary asserts (Br. 40-41)that Section 8(i)(2) implicitly limits the personal voter data that Section 8(i)(1) renders disclosable to the data in the enumerated records.

Section 8(i)(2), however, is not limited to its examples. It states that "[t]he records maintained pursuant to paragraph (1) shall *include*" the enumerated records. 52 U.S.C. 20507(i)(2) (emphasis added). And "the word 'include' indicates the list is illustrative rather than comprehensive." *Del Grosso* v. *Surface Transp. Bd.*, 898 F.3d 139, 142 (1st Cir. 2018). Indeed, Congress debated the extent to which it would restrict disclosure under Section 8(i), see S. Rep. No. 6, 103rd Cong., 1st Sess. 40 (1993) (Senate Report), and settled on the two narrow categorical exceptions that it listed in Section 8(i)(1), see 52 U.S.C. 20507(i)(1). Limiting Section 8(i)'s coverage of voter data only to the enumerated examples in Section 8(i)(2) "would render" these express exclusions in Section 8(i)(1) "superfluous." *Baker* v. *Smith & Wesson, Inc.*, 40 F.4th 43, 49 (1st Cir. 2022).

Section 8(i)(2) does not exclude other records; it merely "describes" certain "set[s] of records that must be" created and "maintained." *Project Vote*, 682 F.3d at 337.

The Secretary then points to a 1994 FEC guidance document. Br. 42-44. This document discusses Section 8(i)(2)'s express examples of disclosable records; it then says that States might also wish to retain "for the same period of time all records of removals from the voter registration list," but "[a]s a matter of prudence, * * * not as a requirement of the Act." National Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* 7-1 (Jan. 1, 1994), https://perma.cc/Z5UL-LPBY.

This statement cannot sustain the Secretary's interpretation of Section 8(i). For one thing, the FEC's rulemaking authority never extended to the NVRA's public disclosure provision. See Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)); contra Sec'y Br. 42.[3] Hence, as the guidance document itself notes, the FEC "d[id] *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets [its] requirements"; its suggestions were "offered without force of law, regulation, or advisory opinion." National Clearinghouse on Elec. Admin. at P-1; see *United States* v. *Mead Corp.*,

[3] HAVA transferred the FEC's functions and powers under the NVRA to the Election Assistance Commission. See Pub. L. No. 107-252, § 802, 116 Stat. 1726 (52 U.S.C. 20508(a)).

533 U.S. 218, 231-232 (2001). For another, the statement's placement after discussion of Section 8(i)(2) suggests that the FEC may have believed that *only* those records specified in Section 8(i)(2) must be retained and disclosed—a reading that, as just discussed, would run afoul of the statutory text. However, the document gives no rationale for the statement upon which the Secretary relies. And it is the statute's clear language that ultimately controls. See *Goncalves Pontes* v. *Barr*, 938 F.3d 1, 3 (1st Cir. 2019).

## II

## THIS COURT SHOULD CERTIFY THE QUESTION OF EXCEPTION J'S SCOPE TO THE MAINE SUPREME JUDICIAL COURT

Whether the NVRA preempts Exception J depends on what Exception J actually restricts. The district court determined that Maine's Use Ban would prohibit using Voter File data either to help analyze other States' NVRA compliance or to enforce the NVRA against other States, and that the Dissemination Ban would prohibit requestors from publicly releasing Voter File data. Doc. 87, at 11-12 & nn.17-18. PILF has gone further, arguing that the Use Ban would prohibit it even from using Voter File data to enforce the NVRA against Maine. Doc. 84, at 5-6. The Secretary does not dispute (Br. 46) the district court's characterization of the Dissemination Ban, but she argues (Br. 58-61) that the Use Ban would not prohibit PILF from enforcing the NVRA or analyzing other States' NVRA compliance.

This state-law interpretive dispute is best resolved by Maine's highest court. While "federal courts have the power" and "the duty" "to adopt narrowing constructions of *federal* legislation," they "are without power to adopt a narrowing construction of a *state* statute unless such a construction is reasonable and readily apparent." *Boos* v. *Barry*, 485 U.S. 312, 330-331 (1988) (emphases added). Bedrock federalism principles animate this distinction. For one thing, "the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Off. Eng.* v. *Arizona*, 520 U.S. 43, 79 (1997). For another, any federal interpretation could well prove ephemeral, "because federal courts cannot make their state-law interpretations binding on state courts." *Mount Vernon Fire Ins. Co.* v. *VisionAid, Inc.*, 875 F.3d 716, 728 (1st Cir. 2017). For this same reason, "Supreme Court precedent warns against accepting as authoritative an Attorney General's interpretation of state law when the Attorney General does not bind the state courts or local law enforcement authorities, as is the case in Maine." *NCTA -- The Internet & Television Ass'n* v. *Frey*, 7 F.4th 1, 19 n.13 (1st Cir. 2021) (internal citation and quotation marks omitted).

Here, both parties put forward plausible interpretations of Exception J, and no Maine court has yet passed on the statute's meaning. Indeed, the Use and Dissemination Bans are even more ambiguous than the parties' disagreements

illustrate. Perhaps because Maine enacted it in response to PILF's lawsuit, Exception J mentions only "list maintenance." Me. Stat. Tit. 21-A, § 196-A(1)(J) and (1)(J)(1) (2023). It thus appears to forbid requestors from using Voter File data to help register voters, even though increasing registration is a key purpose of the NVRA. Meanwhile, the Dissemination Ban does not define what constitutes making data "accessible by the general public." *Id.* § 196-A(1)(J)(2). Would it include engaging in a "door-to-door canvassing effort to confirm the accuracy of" duplicated or error-ridden voter records (Doc. 84, at 6), or contacting voters to tell them they had been removed from the rolls?

"Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when … the state courts stand willing to address questions of state law on certification from a federal court." *Arizonans for Off. Eng.*, 520 U.S. at 79 (citation omitted). Certification is appropriate here. This Court "may certify a question to the [Maine Supreme Judicial Court acting as the] Maine Law Court where there are 'questions of [Maine] law ... that may be determinative of the cause and ... there is no clear controlling precedent in the decisions of the Supreme Judicial Court.'" *Franchini* v. *Investor's Bus. Daily, Inc.*, 981 F.3d 1, 10 (1st Cir. 2020) (second alteration in original) (quoting Me. R. App. P. 25(a)). The Court may certify *sua sponte*, even if "[n]o request for certification was made" by the parties "in the district court or in

this court." *Brown* v. *Crown Equip. Corp.*, 501 F.3d 75, 77 (1st Cir. 2007), certified question answered, 960 A.2d 1188 (Me. 2008). A binding, limiting construction of state law could eliminate the preemption dispute over the Use Ban and at least narrow the dispute over the Dissemination Ban, helping to avoid unnecessary constitutional rulings.

## III

## IF THE DISTRICT COURT CORRECTLY INTERPRETED THE USE AND DISSEMINATION BANS, THE NVRA PARTIALLY PREEMPTS THEM

### *A. As Interpreted By The District Court, The Use And Dissemination Bans Pose Obstacles To Fulfilling The NVRA's Purposes And Therefore Are Preempted To The Extent Of The Conflict*

Should the Court decline to certify, or should the Maine Supreme Judicial Court broadly interpret Exception J's restrictions, then the preemption issue will persist. Assuming the district court correctly read the Use Ban, and based on the parties' agreed reading of the Dissemination Ban, the district court's preemption analysis is largely correct. See Doc. 87, at 12-13. Both bans have applications that conflict with Section 8(i) as read in light of the NVRA's purposes, and the NVRA preempts them as to those applications, including in this case. But preemption extends only to applications of Exception J that prohibit uses or disseminations of disclosed information that would further the NVRA's purposes.

As the NVRA lacks an express preemption provision, "the parties have focused their arguments solely on * * * 'obstacle preemption.'" *Maine Forest*

*Prods. Council* v. *Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). Obstacle preemption occurs when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ibid.* (citation omitted).

Certain standards designed to limit preemption do not apply to statutes enacted under the Elections Clause. That Clause "invests the States with responsibility for the mechanics of congressional elections, but" grants Congress "paramount" authority to override States' choices. *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citations omitted). In short, the Elections Clause itself confers preemptive power. *Id.* at 14. This means that the presumption against preemption used in Supremacy Clause cases does not apply to "Elections Clause legislation" like the NVRA. *Id.* at 15. Nor need courts search for evidence of congressional intent to preempt contrary state laws. See *id.* at 14. And in Elections Clause cases, courts "do not finely parse the federal statute for gaps or silences into which state regulation might fit," as doing so "could fundamentally alter the structure and effect of" the federal statute. *Fish* v. *Kobach*, 840 F.3d 710, 729 (10th Cir. 2016).

1. The central preemption inquiry is whether the NVRA "confers a right on private actors (either explicitly or implicitly) that conflicts with [Exception J's] restrictions." *Maine Forest Prods. Council*, 51 F.4th at 8. "[I]n determining the

preemptive scope of a congressional enactment, [courts] rely on the plain language of the statute and its legislative history." *Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc.* v. *Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (citation omitted). Here, both indicate that Congress intended to authorize disclosure, dissemination, and use of records in aid of the NVRA's purposes.

a. Section 8(i) requires States to "make" covered records "available for public inspection and, where available, photocopying." 52 U.S.C. 20507(i)(1). This language plainly contemplates uniform disclosure. It gives every member of the public a right to view and copy the same information upon request—a right they may enforce through litigation. 52 U.S.C. 20510(b). States may not "condition[] that right * * * upon compliance with a rule" that "is inconsistent in both purpose and effect with the remedial objectives of the federal" statute. *Felder* v. *Casey*, 487 U.S. 131, 153 (1988).

Congress enacted the NVRA to "provide uniform national voter registration procedures for Federal elections." Senate Report 3. By doing so, Congress stated in the NVRA's text, it aimed both to expand voter registration and to protect the integrity of the electoral process. See 52 U.S.C. 20501(b). Because it often is necessary to use or disseminate disclosed data to fulfill these twin purposes, States may not condition Section 8(i)'s disclosure right on compliance with overbroad use or dissemination restrictions. See *Felder*, 487 U.S. at 153. For similar reasons,

one also may view Section 8(i)'s disclosure right as carrying with it additional "implicit federal right[s]," *Maine Forest Prods. Council*, 51 F.4th at 10, to use and disseminate the disclosed information as needed to fulfill the NVRA's purposes.

Disclosure is necessary to determine whether those who are eligible to vote have been registered and remain on the rolls, but voter data must then be used and circulated to the broader public if voter registration is ever to be increased as a result. See *Voter Registration: Hearing Held Before the Subcomm. on Elections of the H. Comm. on Admin.*, 103rd Cong., 1st Sess. 111 (1993) (statement of Edward A. Hailes, Counsel, Wash. Bur., NAACP) (praising inclusion of Section 8(i) in draft NVRA because "[t]hese records could be used to identify and assist voters ensnared in a state of voting rights uncertainty").

Similarly, "[i]t is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. But to analyze and advocate for improvements to list maintenance practices, it often will be necessary to *use* voters' data and to *disseminate* it to election officials or others.

Congress recognized, too, that "an effective national voter registration program must also include private civil enforcement," which "can encourage action to assure that a reasonable effort is undertaken to achieve [the registration program's] objectives in all States." Senate Report 21. Such civil enforcement

efforts also will often require using—and may require publicly revealing—certain personal voter data.

b. Pointing to the Freedom of Information Act (FOIA), the Privacy Act, and the Civil Rights Act of 1960, the Secretary counters (Br. 35-36, 56-57) that Congress has implemented a general federal policy of protecting privacy. But each of these statutes imposes its own unique set of restrictions on disclosure, use, and dissemination—restrictions that Section 8(i) does not share. See 5 U.S.C. 552(b)(6) (FOIA) (creating general disclosure exemption for personal privacy but imposing no post-disclosure restrictions); 5 U.S.C. 552a(b) (Privacy Act) (limiting disclosure only to certain recipients or to recipients promising to use information for specified purposes); 52 U.S.C. 20703 and 20704 (Civil Rights Act) (restricting disclosure to Attorney General and strictly limiting further dissemination). Far from indicating a blanket federal policy of privacy protection, the distinctions between each of these laws shows that Congress balances anew in each disclosure statute the benefits of public knowledge with the costs of reduced privacy.

2. Having demonstrated the private disclosure right that Section 8(i) affords, along with the use and dissemination rights that flow with it, "the conflict with [Exception J] becomes starkly apparent." *Maine Forest Prods. Council*, 51 F.4th at 10. The Use Ban, as the district court interpreted it, would prohibit using Voter File data to examine other States' compliance with the NVRA. Doc. 87, at 11.

The Use Ban also may outlaw using Voter File data for voter registration activities. See p. 20, *supra*. Such uses of data are needed to fulfill the NVRA's purposes, and Section 8(i) protects them. Likewise, the district court determined that the Use Ban would prohibit using the Voter File as evidence to help enforce the NVRA against another State. Doc. 87, at 12 n.18. Not only would this improperly condition Section 8(i)'s core disclosure right and conflict with Section 8(i)'s implicit right to use disclosed data; it also would interfere with the NVRA's private right of action for anyone "aggrieved," regardless of "the State involved." 52 U.S.C. 20510(b)(1).

The Dissemination Ban, too, conflicts with the NVRA. Section 8(i) requires records to be "ma[d]e available for public inspection." 52 U.S.C. 20507(i)(1). Dissemination restrictions thus burden the rights both of requestors and of the broader public entitled to view this information. Public interest groups and others often use lists of names and addresses in a public way to help enforce the NVRA's purposes, whether to re-register erroneously removed voters or to force States to improve their list-maintenance processes. But the Dissemination Ban prohibits making public any information that even could be combined with *other* information to identify voters. Me. Stat. Tit. 21-A, § 196-A(1)(J)(2) (2023). Exception J would thus prohibit a requestor, for instance, from creating a website with a list of "inactive" voters and encouraging voters to check if they are

on the list so they can avoid removal from the rolls. This broad ban on publicizing disclosed information "is 'inconsistent with' the NVRA's mandate" as applied to circumstances in which public dissemination would serve the NVRA's purposes. *Arizona*, 570 U.S. at 15 (citation omitted).

Maine still can enforce Exception J when it would not interfere with the NVRA's express purposes. And Maine could pass a narrower, better-defined set of use and dissemination limits. But as interpreted by the district court, the NVRA partially preempts the current bans.

*B. NVRA Preemption Does Not Prohibit Redaction Of Sensitive Voter Information Or Enforcement Of Other Laws Prohibiting The Misuse Of Personal Data*

While Maine's privacy concerns do not justify an unduly restrictive reading of Section 8(i)'s text and purposes, those concerns are substantial. It is important, therefore, to emphasize the limits on Section 8(i)'s preemptive scope. The line between permissible and impermissible conditions on disclosure can be complex and fact-dependent; what follows are merely illustrative examples of acceptable restrictions.

First, the NVRA does not prohibit States from redacting "uniquely sensitive information" like voters' Social Security Numbers before disclosing records. *Project Vote*, 682 F.3d at 339. Nor does it prohibit redacting an even broader set of personal information in certain sensitive circumstances—for instance, the names

and personal information of people subjected to criminal investigation (but later exonerated) on suspicion of being illegally registered to vote. See *Public Int. Legal Found.*, 996 F.3d at 267.

Second, Section 8(i) does not preempt state-law use restrictions as to uses that would not further the NVRA's purposes. For instance, as the Secretary notes (Br. 45), many States prohibit using information from voter registration lists for commercial purposes. Such prohibitions do not "frustrate[]" the NVRA's "operation within its chosen field" and so would not be preempted. *Emanuelli Hernandez*, 58 F.4th at 11 (citation omitted).

Third, similarly, the NVRA does not preempt bans on disseminating personal data whose public broadcasting is not necessary to achieve the NVRA's purposes. For example, States may need to disclose voters' years of birth, parties of registration, or voting history so requestors can determine whether States are complying with the NVRA's list-maintenance and non-discrimination requirements. See 52 U.S.C. 20507(b). But, outside the contexts of directly assessing and litigating NVRA compliance, state publication bans would be less likely to impede the statute's purposes.

Finally, the NVRA does not authorize requestors to disseminate disclosed information for a purpose or in a manner that harms voters. Most prominently, the NVRA's disclosure provision does not revoke or preempt federal or state laws

against voter intimidation. Contra Sec'y Br. 57. Both the NVRA and federal criminal law authorize prosecutions for willfully intimidating, threatening, or coercing people for registering to vote or voting. 18 U.S.C. 594; 52 U.S.C. 20511(1). The Voting Rights Act also authorizes civil suits to prevent or remedy acts with the effect of intimidating voters. See 52 U.S.C. 10307(b) and 10308(d). And nearly all States, including Maine, impose their own restrictions on voter intimidation, threats, or coercion. See Theodore Z. Wyman, *Litigation of Voter Intimidation Law* § 8, 174 Am. Jur. Trials 385 (May 2023). Additionally, the NVRA does not preempt state laws prohibiting libel or other dangerous uses of voters' information.

Below, PILF agreed with several such limits on NVRA preemption. Noting Maine's concerns about publicizing "ethnic and language minorities[']" personal information, voter intimidation, and "misuse by 'scammers, hackers, commercial interests, or foreign governments,'" PILF stated that it "does not allege an intention to engage in these activities nor that they were intended by Congress, much less that they would further the NVRA's objectives." Doc. 84, at 3 (citations omitted). It has made similar concessions on appeal. PILF Br. 50-51, 52. PILF was right to acknowledge these limits on preemption but wrong to claim (PILF Br. 50) that disclosures of personally identifiable information are "imaginary monsters." See

Sec'y Br. 14-15, 49-51. This Court also should emphasize limits on preemption—plus the others discussed above—to avoid abuse of sensitive voter data.

## CONCLUSION

This Court should certify to the Maine Supreme Judicial Court, or else affirm on the issues addressed herein.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 598-0243

## CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE URGING CERTIFICATION OR AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6488 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365, in 14-point Times New Roman font.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
Attorney

Date: July 25, 2023

**CERTIFICATE OF SERVICE**

I certify that on July 25, 2023, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE URGING CERTIFICATION OR AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
Attorney