No. 23-1361

# United States Court of Appeals
## For the First Circuit

PUBLIC INTEREST LEGAL FOUNDATION, INC.

Plaintiff – Appellee

v.

SHENNA BELLOWS, in her official capacity as the
Secretary of State for the State of Maine

Defendant – Appellant

*On appeal from the United States District Court, District of Maine*

## REPLY BRIEF OF DEFENDANT-APPELLANT
## SHENNA BELLOWS

AARON M. FREY
Attorney General

Thomas A. Knowlton
Deputy Attorney General

Of Counsel

Jonathan R. Bolton
Assistant Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov

*Attorney for Appellant*

# Table of Contents

Table of Contents ...............................................................................i

Table of Authorities............................................................................ii

Introduction.......................................................................................1

Reply Argument ................................................................................3

I.    The district court erred in concluding that § 8 of the NVRA applies
      to the Voter File. ......................................................................3

      A.    The plain language of § 8(i) cannot be read to encompass a
            compilation of 1.1 million voters' personal information.........3

      B.    The structure of § 8 supports the Secretary's reading. ........13

      C.    Agency interpretation of the NVRA near the time of
            enactment supports the Secretary's view............................15

      D.    The lower court's reading of § 8(i) does not further the
            NVRA's purposes.................................................................16

II.   The district court erred in concluding that the Publication Ban is
      preempted by the NVRA. ...........................................................17

III.  The district court erred by granting relief relating to Exception J's
      other restrictions on use of the Voter File. ..................................28

Conclusion .......................................................................................33

Certificate of Compliance with Rule 32(a)...........................................34

Certificate of Service Form for Electronic Filing..................................35

## Table of Authorities

### CASES

*Arsenault v. Sec'y of State*, 2006 ME 111, 905 A.2d 285 ........................32

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ...........................6

*Fusaro v. Howard*, 19 F.4th 357 (4th Cir. 2021) ...................................26

*Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425
 (D. Md. 2019)........................................................................... 11, 22, 23

*Kenney v. U.S. Postal Serv.*, 298 F. Supp. 2d 139
 (D. Me. 2003) ........................................................................................6

*Maine Forest Products Council v. Cormier*, 51 F.4th 1
 (1st Cir. 2022) .....................................................................................22

*Manirakiza v. Dep't of Health & Hum. Servs.*, 2018 ME 10,
 177 A.3d 1264......................................................................................29

*Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011)...............31

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers
 Ins. Co.*, 514 U.S. 645 (1995) ...............................................................8

*Oneok, Inc. v. Learjet Inc.*, 575 U.S. 373 (2015)....................................20

*Project Vote/Voting for America v. Long*, 682 F.3d 331
 (4th Cir. 2012) .............................................................................. 12, 14

*Public Interest Legal Foundation v. Matthews*, 589 F. Supp. 3d 932
 (C.D. Ill. 2022)......................................................................................8

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of
 Elections*, 996 F.3d 257 (4th Cir. 2021) ...............................................13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................31

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) .. 12, 27

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................16

*Voter Reference Foundation, LLC v. Balderas*, 616 F. Supp. 3d. 1132,
   1159, 1166 (D.N.M. 2022) ............................................................ 19, 23

## STATUTES

1 M.R.S.A. § 402 ............................................................................ 21

21-A M.R.S.A. § 196-A ........................................................ 2, 21, 22, 28

52 U.S.C. § 20501 .......................................................................... 16

52 U.S.C. § 20507 .................................................................. 3, 5, 7, 18

52 U.S.C. § 20508 .......................................................................... 15

P.L. 2005, ch. 404 ...................................................................... 26, 27

## Introduction

The broad interpretation of § 8(i) of the National Voter Registration Act (NVRA) offered by Plaintiff-Appellee Public Interest Legal Foundation (PILF) is fatally flawed because it collapses a complex provision full of qualifying terms into what amounts to a blanket requirement that the States make all their voter-registration-related records public. PILF offers not a single example of a state record relating to voter registration that would be excluded from the reach of § 8(i) under its interpretation of the statute. Indeed, its sweeping interpretation would seem to leave no room for such a category of records. If Congress had intended to make every scrap of paper and bit of data relating to voter registration available for public inspection, it would have written a very different statute. The Court should give real meaning to § 8(i)'s limiting terms by interpreting them to exclude the record at issue here: a compilation of personal data on each of Maine's over 1 million registered voters (the "Voter File").

Even if the Voter File is within the outermost reaches of § 8(i)'s scope, PILF and *amici* fail to demonstrate that Maine's reasonable limitations on requestors' use and publication of personal data within

1

the Voter File, contained in 21-A M.R.S. § 196-A(1)(J) ("Exception J"),
pose any obstacle to congressional purposes in enacting § 8(i), such that
those limitations are preempted.  PILF fails to establish that Exception
J's limitations interfere in any planned activities involving the Voter
File that Congress might have plausibly intended to facilitate through
§ 8(i).  Indeed, the only thing PILF wishes to do but cannot do under
Exception J is make available to the general public the personal
information of individual Maine voters.  Such publication of voter
personal data is both unnecessary to further the NVRA's election-
integrity purposes and inimical to its most important purpose:
encouraging Americans to register to vote.

Finally, PILF fails to establish any realistic threat that Maine will
enforce Exception J against it for using the Voter File to conduct
evaluation or enforcement activities in other states.  PILF offers an
overbroad interpretation of Exception J that ignores legislative intent
and that has been disavowed by both the Maine Attorney General and
the Secretary of State ("Secretary") to manufacture an enforcement
threat.  The Court should conclude that PILF lacks standing to bring
such a phantom preemption claim.

**Reply Argument**

**I.     The district court erred in concluding that § 8 of the NVRA applies to the Voter File.**

   **A. The plain language of § 8(i) cannot be read to encompass a compilation of 1.1 million voters' personal information.**

The Secretary showed in her main brief that § 8(i) is a carefully worded disclosure provision meant to target records that illuminate state conduct that resembles the organized voter-list maintenance activities required and regulated by the rest of § 8.  Sec'y Br. at 23–31. Rather than enacting a blunderbuss disclosure provision targeting something like "all records concerning voter registration programs and activities," Congress enacted a wordy provision replete with limiting terms, including most notably requirements that, to be subject to § 8(i), the records must relate to programs and activities "conducted for the purpose of ensuring" accuracy and currency of voter lists and that the records must concern "implementation" of such programs and activities. 52 U.S.C. § 20507(i)(1).  Extending § 8(i) to cover the entirety of Maine's

statewide voter list—a static list of personal information concerning 1.1 million Maine voters—reads these limiting terms out of the statute.[1]

PILF distorts the above argument into a straw-person. It suggests that the Secretary's interpretation of "for the purpose of ensuring" cannot be correct because it would be limited to list-maintenance activities that have an "error rate" of zero. PILF Br. at 27. But that is neither what Congress wrote nor the Secretary's interpretation. Under the plain text of § 8(i), activities need not *in fact* ensure, to a 100% certainty, that the voter rolls are accurate and current to be covered; they must simply be "for the purpose" of ensuring accuracy and currency. Records of governmental list-maintenance efforts are covered whether those efforts are well-designed or not.

Both PILF and *amicus* United States further argue that the phrase "purpose of ensuring" does not support a distinction between

---

[1]     *Amicus* Judicial Watch appears to be under the misimpression from the above argument that the Secretary is seeking to "withhold[]" part or all of the Voter File from PILF. Judicial Watch Br. at 13. To be clear: PILF is free under Exception J to purchase a copy of the Voter File at any time. *See* Add. at 18. The Secretary's point is that § 8(i) cannot preempt the limitations on use and dissemination in Exception J because § 8(i) does not apply to the Voter File.

day-to-day ministerial activities like processing voter registration applications and the sort of concerted voter-list maintenance efforts that the Secretary of State has periodically conducted. PILF Br. at 28; USA Br. at 14–15; *see* A343 (Pl.'s Resp. to Def.'s Statement of Mat. Facts ("SMF") ¶ 63). But if Congress had wished § 8(i) to cover activities that simply "make" the voter rolls accurate and current, it would have used that word. It chose a different, more specific phrase, "for the purpose of ensuring," that must be given independent meaning.

Though *amicus* United States suggests that Congress would have included even more limiting language if it had intended such a result, USA Br. at 15, there was no need. Use of the phrase "for the purpose of ensuring" in a section of the NVRA that regulates, for example, "voter removal programs," 52 U.S.C. § 20507(c), and programs and activities relating to "confirmation of voter registration," *id.* § 20507(b) is, by itself, enough to connect the scope of § 8(i) to the sort of concerted maintenance activities described elsewhere in that section.

PILF also disputes the Secretary's point that § 8(i) does not cover activities that might have the effect of ensuring accuracy and currency but do not have the purpose of generating those results. PILF Br. at 29.

Here, again, PILF is simply ignoring limiting words in § 8(i) that undermine its interpretation. The "purpose" requirement is not something that the Secretary is inferring from statutory structure or legislative intent; it is stated in the plain text of the statute. Any interpretation of § 8(i) that fails to give meaning to the requirement that the records concern programs and activities "*for the purpose* of ensuring" accuracy and currency, as PILF's interpretation does, violates the canon against surplusage. *See City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020).

PILF argues that the Voter File is covered by § 8(i) because it is the "end product" of Maine's voter list maintenance activities. PILF Br. at 19–23.[2] PILF apparently means that, when the State conducts programs and activities to ensure accuracy and currency of the voter list, any errors discovered will ultimately result in updates to the voter

---

[2]     In making this argument, PILF cites portions of a deposition transcript of Deputy Secretary of State Julie Flynn. However, PILF did not include in its summary judgment motion any statements of material fact based on Deputy Flynn's deposition testimony. A204–211. That deposition testimony therefore should not be considered. *See Kenney v. U.S. Postal Serv.*, 298 F. Supp. 2d 139, 144 (D. Me. 2003).

records contained in the Voter File.  This argument, however, ignores a second limitation in § 8(i): the requirement that the record at issue relate specifically to "implementation" of the program or activity.  52 U.S.C. § 20507(i)(1).  Even if it could be said that the Voter File, in some attenuated way, concerns programs or activities intended to ensure accuracy and currency of the voter list, it does not show how those programs were "implement[ed]."  The Voter File does not, for example, show voters whose registrations were cancelled, let alone the reasons for those cancellations.  A345 (SMF ¶ 69).  Nor does it indicate which voters have had their information altered as a result of list-maintenance activities.  *Id.* (SMF ¶ 70).

As with "for the purpose of ensuring," PILF's interpretation seeks to read "implementing" out of the statute.  In PILF's view, the Voter File concerns implementation of those activities merely because portions of the Voter File would look different if those activities had never taken place.  But this is the sort of overbroad interpretation of terms like "concerning" or "relating to" that the Supreme Court has warned against because it allows for "infinite relations."  *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514

U.S. 645, 656 (1995). Every record having something to do with elections could be described as "concerning" voter registration in some attenuated way. But that does not mean § 8(i) extends to all such records.

Under PILF's interpretation, the terms "concerning" and "implementation" are not harmonized to give both independent meaning; instead, "concerning" is read so broadly that § 8(i) would have exactly the same meaning whether "implementation" was included in the statutory text or not. The Secretary's more modest interpretation of "concerning," in contrast, allows for a harmonious reading of § 8 that gives meaning to *all* its terms and phrases.

Thus, while PILF cites in support of its position *Public Interest Legal Foundation v. Matthews*, 589 F. Supp. 3d 932 (C.D. Ill. 2022), which held an interpretation of § 8(i) similar to the Secretary's to be "unbalanced," PILF Br. at 23 (quoting 589 F. Supp. 3d at 940), PILF's interpretation is the unbalanced one. A balanced interpretation of § 8(i) requires giving independent meaning to § 8(i)'s limiting terms and phrases, which the Secretary does and PILF does not.

8

PILF also points to § 8(i)(2), which requires states to retain and allow public inspection of lists of voters who were targeted for de-registration under the procedures set forth in § 8(d).  PILF Br. 30–31. PILF argues that this provision undermines the Secretary's interpretation because these records do not "describe or document 'how' an activity was 'put into practice.'"  *Id.* at 31.  But PILF is wrong; each name on that list reflects a decision by a state to target a particular voter for potential de-registration.  Unlike the Voter File, the § 8(i)(2) list does show the "how" of a state's list-maintenance programs, and does so in a manner that avoids disclosure of massive amounts of voter personal information irrelevant to the implementation of those programs.

In any event, PILF's argument proves the Secretary's point; if the plain meaning of § 8(i)(1) clearly covered voter lists, there would have been no need for Congress to enact § 8(i)(2).  It was presumably enacted precisely because it would not otherwise have been clear that records concerning implementation of programs and activities "for the purpose of ensuring" accuracy and currency included such lists.  The existence of

§ 8(i)(2) is thus further proof that § 8(i)(1) is not as unambiguously broad as PILF asserts.

PILF further argues that the Voter File is within the scope of § 8(i) because it is a "compilation of voter registration applications." PILF Br. at 23.  But this argument is based on two false premises: one, that the Voter File can be fairly described as a compilation of voter registration applications and, two, that such applications are themselves within the scope of § 8(i).  The Secretary showed in her main brief that neither premise is correct.  Sec'y Br. at 32–34, 37.  The Voter File in fact contains other information, most notably voter participation history, that is in no way derived from voter registration cards.[3]  A340 (SMF ¶ 51).  It is a distinct record from a voter registration application or even a compilation of voter registration applications.[4]

---

[3]     PILF argues that the Secretary waived this point by failing to raise it below.  PILF Br. at 33.  But the Secretary is disputing the District Court's characterization of the Voter File.  *See* Add. at 29.  Moreover, the Secretary did argue more generally that the Voter File is a distinct record that would not be within the scope of § 8(i) even if registration applications were covered.  R. in Support of Mot. to Dismiss at 4–5 (ECF No. 60).

[4]     PILF also argues that voter participation history is separately public under § 8(i) because, under § 8(d) and Maine regulations, a voter

Moreover, even if the Voter File could be described as a compilation of registration applications, that would still not place it within the scope of § 8(i). A voter registration application would only fall within § 8(i) if the Court accepts the notion that a registrar's act of processing that application is somehow an activity "for the purpose of ensuring" the accuracy and currency of Maine's voter lists. As the Secretary has demonstrated, Sec'y Br. at 32–34, this overbroad reading of § 8(i) ignores that the processing of an application does not, in any meaningful sense of the word, "ensure" accuracy and currency of the existing voter list.

PILF relies on district court decisions from other circuits to support its claim. PILF Br. at 24–25. But the first of these decisions, *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), was issued by a court that was bound by *Project Vote/Voting for America v.*

---

who fails to respond to a § 8(d)(2) postcard can be removed if they fail to vote in the next two general elections. But even assuming *arguendo* the recent participation history of voters who received § 8(d)(2) postcards might be within the scope of § 8(i), PILF is seeking a far broader data set encompassing the participation history of every voter in the State of Maine.

*Long* ("*Project Vote*"), 682 F.3d 331 (4th Cir. 2012), discussed in the Secretary's main brief, *see* Sec'y Br. at 32–35, which incorrectly held that voter registration applications fell within § 8(i).  Moreover, *Lamone* failed to grapple with the distinction between an individual voter registration application and a complied list of personal data from multiple sources on every single voter in a jurisdiction.  Treating such a data trove as identical to a single voter registration card ignores both the more attenuated relationship to voter registration activities and the greater potential for abuse of such a massive compilation of data.

PILF also relies on *True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014), for its "compilation of voter registrations" argument. PILF Br. at 25.  But that decision's observation that Mississippi's "voter roll" was disclosable under § 8(i) because it was Mississippi's "official list of eligible voters" is dicta, since the court held that the issue was moot since the plaintiffs already had a copy of the list.  43 F. Supp. 3d at 723–24.  Moreover, it is dicta supported by only a single sentence of analysis, robbing it of any persuasive authority.  *Id.* at 723.

**B. The structure of § 8 supports the Secretary's reading.**

The Secretary also demonstrated that the structure of § 8, which largely regulates states' purposeful periodic list-maintenance programs, supports her interpretation of § 8(i) as limited to records concerning those programs and activities. Sec'y Br. at 38–42.

PILF argues that there is no need for the Court to consider statutory structure because the text is unambiguous. PILF Br. at 35. The Secretary agrees. But PILF is mistaken that the text is unambiguous in its favor. If anything, application of the canon against surplusage to Congress's complex phrasing of § 8(i) renders the Secretary's interpretation the only permissible one.

PILF also notes that the handful of courts that have interpreted § 8(i) have not identified any ambiguity in it. *Id.* But several courts have read restrictions into § 8(i) that are not apparent from its plain text. Most notably, in *Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections* ("*PILF*"), 996 F.3d 257 (4th Cir. 2021), the Fourth Circuit concluded that a correct interpretation of § 8(i) required consideration of other federal privacy laws unconnected to the NVRA. *Id.* at 264.

13

PILF also asserts that nothing can be read into Congress's failure to expressly include voter lists in § 8(i) because it would have been too hard for Congress to specify all of the categories of records it intended for inclusion within § 8(i).  PILF Br. at 35–36.  But this argument ignores that Congress *did* include in § 8(i)(2) a specific category of records with personally identifying information it wished to include in § 8(i)—lists of voters who were sent (d)(2) postcards.

PILF asserts that (i)(2) "sets 'a floor, not a ceiling'" for disclosable records.  PILF Br. at 36 (quoting *Project Vote*, 682 F.3d at 337).  *Amicus* United States makes a similar argument.  USA Br. at 16.  That assertion is correct, but irrelevant. The Secretary is not arguing that the scope of § 8(i)(1) is "limited to" the records described in § 8(i)(2). Rather, she is arguing is that it is far more doubtful that the text of § 8(i)(1) covers the entire Voter File than that it covers lists of voters who are the actual targets of list-maintenance programs.  Yet Congress felt the need to clarify that the latter fell within the scope of § 8(i)(1) while saying nothing at all about the former.  The Court should conclude that this disparity shows a lack of legislative intent to include such records.

14

**C. Agency interpretation of the NVRA near the time of enactment supports the Secretary's view.**

The Secretary also pointed to a guidance document issued by a division of the Federal Election Commission (FEC), which interpreted § 8(i) consistently with the Secretary's interpretation.  Sec'y Br. at 42–44.

PILF and the United States argue that the guidance document should be given no weight because the FEC had limited responsibilities under the NVRA and could not issue authoritative interpretations of its provisions.  PILF Br. at 38; USA Br. at 17.  They also point to a disclaimer in the guidance document stating that interpretations in the document are "without force of law, regulation, or advisory opinion." *Id.*

While the FEC's authority relating to the NVRA may have been limited, Congress specifically charged it with providing "information to the States with respect to the responsibilities of the States under [the NVRA]."  52 U.S.C. § 20508(a)(4).  Implicit in this directive is a congressional expectation that the FEC would interpret the NVRA to determine what those "responsibilities" actually were.  Thus, disclaimers about legal force notwithstanding, the FEC's interpretation of the NVRA should be considered by the Court under the flexible

standard set forth in *United States v. Mead Corp.*, 533 U.S. 218 (2001), for such informal interpretations by federal agencies.

Indeed, there is at least one particular "source[] of weight," *id.* at 235, that warrants consideration of the guidance document: it was issued only months after enactment of the NVRA in 1993. Thus, while the guidance document is not dispositive of § 8(i)'s meaning, it is an important data point showing an expert federal agency's interpretation of § 8(i) at the time of its passage.

### D. The lower court's reading of § 8(i) does not further the NVRA's purposes.

Finally, the Secretary established in her main brief that her interpretation of § 8(i) is the only one that does not run afoul of NVRA's key purpose of "mak[ing] it possible for Federal, State, and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(2). Exposing voters' personal information invites, among other harms, potentially baseless assertions of fraud and criminality against ordinary voters. *See, e.g.*, A346–47 (SMF ¶¶ 73–78).

*Amicus* United States suggests that allowing public access to voter personal information would further the NVRA's purpose of encouraging

16

participation in elections.  USA Br. at 13.  But the facts that PILF's analyses produce "false positives" and that it cannot reach definitive conclusions undermine this notion.  A349 (SMF ¶¶ 84–85).

Moreover, it is unclear how, as the United States claims, review of the Voter File would help a private requestor determine if a State is "rejecting applicants only for legitimate reasons."  USA Br. at 13.  The Voter File has no information on rejected applicants.  21-A M.R.S.A § 196-A(1)(J) (Supp. 2023).

## II.  The district court erred in concluding that the Publication Ban is preempted by the NVRA.

Even if § 8(i) can be read to extend to a static compilation of voters' personal information, the Secretary has demonstrated that Maine's reasonable limitations on using that data for purposes inimical to the NVRA are not preempted.  The NVRA on its face contains no limitations on states' ability to reasonably limit the use of voter personal data by third parties.  As *amicus* Electronic Privacy Information Center shows, *see* EPIC Br. at 11–16, states around the country have placed common-sense restrictions on use of that data by third parties.  By barring private parties from publishing Mainers' personal data, Maine law furthers a key purpose of the NVRA—and

federal voting rights laws more generally—of encouraging citizens to register to vote and participate in the electoral process.

PILF's brief asserts that the Publication Ban is invalid "primarily" because it supposedly violates the First Amendment. PILF Br. at 46–47. But PILF's amended complaint contains no First Amendment claim or, indeed, any mention of the First Amendment. A171–187. PILF's primary argument against the Publication Ban is thus not even properly before this Court.

PILF also argues that the Secretary's showing that the Publication Ban furthers a key NVRA purpose is irrelevant, because, according to PILF, the Publication Ban conflicts with other NVRA purposes of "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." PILF Br. at 48–49 (quoting 52 U.S.C. § 20501(b)). But those purposes are accomplished by the other provisions of § 8, which, among other things, require states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). The purpose of the disclosure requirement in § 8(i), as is apparent from its text and

statutory structure (as discussed in Part I), is to shed light on *governments'* implementation of those "general program[s]." It was not intended to allow private groups to independently conduct their own shadow-programs of voter list maintenance.

In any event, even if preventing private groups from obtaining personal data on all a State's registered voters would clash with Congress's purposes in enacting § 8(i), Exception J harmonizes Maine law with those purposes by allowing precisely such disclosure. The Publication Ban merely imposes a reasonable condition on requestors: that they not post voters' personal data to the Internet (as at least one group has recently done with another state's voter file, *see Voter Reference Foundation, LLC v. Balderas*, 616 F. Supp. 3d. 1132, 1166 (D.N.M. 2022)) or otherwise make it available to the general public. As the record reflects, PILF can still use the data to alert state officials to any irregularities it identifies and in litigation to enforce the NVRA's requirements. To go further, and conclude that Exception J's restriction on publishing the Voter File to the Internet or otherwise must also yield to the NVRA's general election-integrity purposes would give undue

weight to those purposes at the expense of the NVRA's pro-registration purposes.

PILF cites *Oneok, Inc. v. Learjet Inc.*, 575 U.S. 373 (2015), for the proposition that, in considering obstacle preemption, the Court must consider the "full" objectives of Congress. PILF Br. at 50 (emphasis omitted). The Secretary agrees. But PILF is asking the Court to consider only the NVRA purposes it favors, while ignoring the NVRA's pro-registration purposes, resulting in a distorted view of the NVRA overall. The Publication Ban furthers the NVRA's pro-registration purposes without posing an obstacle to § 8(i)'s election-integrity goals, reasonably understood.

PILF specifically asserts that the Publication Ban thwarts the latter goals in two ways relevant to its planned activities. First, it claims that the Publication Ban interferes with its ability to "educate the public and governmental officials." PILF Br. at 47. But the Publication Ban in no way prevents PILF from doing so. PILF is free to analyze the Voter File and publish whatever conclusions it draws about the condition of Maine's voter list. If it wishes, it can even support those conclusions with data concerning individual voters, as long as it

keeps those voters anonymous. The only thing it cannot do is publish the personal data of individual Maine voters. That such "doxxing" is unnecessary for public education efforts is demonstrated by the fact that PILF itself considers redacting such identifying data from its published reports. A349 (SMF ¶ 87).

Second, PILF claims that the Publication Ban would interfere with its efforts to communicate with public officials about irregularities it might find in Maine's voter list, because such communications might become public records under other states' open-records laws. PILF Br. at 48. There is no such concern for any communications with Maine state or local officials since CVR data is exempt from Maine's Freedom of Access law. *See* 1 M.R.S.A. § 402(3)(A) (2016); 21-A M.R.S.A. § 196-A(1). With regard to communications with out-of-state officials who are unable to protect such data from disclosure, PILF would still be free to identify voters to be investigated based on data obtained from the other jurisdiction, which Maine law does not purport to regulate.

PILF echoes the lower court's citation of *Maine Forest Products Council v. Cormier*, for the proposition that a state law cannot avoid preemption even if it is "complementary" to Congress's goals if it also

involves "a conflict in method."  PILF Br. at 49 (citing *Cormier*, 51 F.4th 1, 11 (1st Cir. 2022)).  *Cormier* is distinguishable.  In that case, the question was whether a Maine law that barred certain employers from hiring foreign workers to drive logging trucks was obstacle-preempted. *Id.* at 3.  This Court held that law to conflict with the federal H-2A visa program, which it interpreted as giving employers a federal right to hire foreign workers under certain conditions.  *Id.* at 10.  It was in that context of a state law preventing the exercise of a federal right that the Court rejected the argument that overlapping policy goals of the two laws should cure the conflict.

The Publication Ban differs because the NVRA does not, explicitly or implicitly, give parties inspecting records under § 8(i) an unfettered right to publicize the information in those records, no matter what the public harm.  Section 8(i) merely provides that such records are subject to inspection and copying.  And Exception J allows for inspection and copying.  21-A M.R.S.A. § 196-A(1)(J).

The situation thus differs from a case like *Lamone*, relied upon by PILF, in which Maryland law barred disclosure of the state's voter file to out-of-staters.  399 F. Supp. 3d at 445.  Under *Lamone*'s fact

pattern—where some requestors could not do what § 8(i) (according to that court's holding) gave them a right to do, *id*.,—*Cormier* might have more relevance. But here, where state law protects the alleged federal right to inspect or copy the Voter File, the Secretary's argument that the Publication Ban furthers the NVRA's key purpose is not only fair game under *Cormier*, but should prevail.

PILF also decries as "imaginary monsters" the NVRA-related harms the Secretary showed will be prevented or mitigated by the Publication Ban, such as publicly and wrongly accusing voters of criminal activity. PILF's argument is a step too far for *amicus* United States, which agrees with the Secretary that such concerns are real and, at least in some cases, state efforts to prevent them are beyond the limits of NVRA preemption. USA Br. at 29. Problems such as foreign-government attempts to access voter data are real. *See* Sec'y Br. at 51 n.5. If a requestor can obtain the Voter File and simply post it to the Internet—for example to "crowd source" detection of irregularities, *see Balderas*, 616 F. Supp. 3d. at 1160—Maine will lose any ability to prevent malicious uses of that data.

PILF's claim that these concerns are irrelevant because PILF does not "allege an intention to engage in these activities" elides that it is keeping its options open as to what it will do with the Voter File. PILF Br. at 51. At summary judgment it provided only a general description of its planned activities, with the caveat that it will "develop more specific plans for the Voter File after" PILF obtains it. A211 (¶¶ 5–37). Given the District Court's categorical ruling that "the restrictions of Exception J" are preempted as applied to PILF, Add. at 18, it is fair for the Court to consider other possible uses of the Voter File, and not just those uses that PILF specifically describes in its filings. PILF's vaguely described "educat[ion]" efforts do not rule out that it could publish reports suggesting that particular named Maine voters may have engaged in misconduct, as it has done in the past.[5] A346–47 (SMF ¶¶ 73–78).

---

[5]    To be clear, the Secretary is not suggesting, as PILF insinuates, *see* PILF Br. at 51, that she would treat PILF differently from any other requestor under Exception J because of its prior actions to publish voter information. Rather, she is arguing that, in this as-applied preemption challenge, the Court should assume that PILF's planned uses of the voter file may include publishing reports consistent with those it has published in the past.

PILF argues that other federal laws already protect against some of the ills that the Publication Ban was intended to address.  PILF Br. at 52.  But the existence of these statutes strongly supports the Secretary's point that there is no conflict between the Publication Ban and federal law, particularly if this Court accepts the Fourth Circuit's conclusion that § 8(i) must be interpreted in light of other provisions of federal law that protect privacy.  *See PILF*, 996 F.3d at 264.  While those federal protections are important bulwarks against some of the most pernicious conduct that would be facilitated by unfettered disclosure of the Voter File, they do not provide assurance to voters, as the Publication Ban does, that their personal information will not be published to the general public.  The Publication Ban is therefore not duplicative of existing protections, but rather provides additional assurances to Maine citizens, consistent with the NVRA's pro-registration purpose, that their personal information will not be misused by third parties if they decide to register to vote.

PILF also attempts to rely on caselaw on "[e]xemptions from facially valid disclosure laws."  PILF Br. at 52.  This caselaw, which discusses circumstances when the First Amendment may require states

25

to protect information that would otherwise be public, is entirely inapposite. Again, this is not a First Amendment case. The Secretary's point is that the Publication Ban poses no obstacle to Congress's purposes, not that the First Amendment requires such a ban.

PILF suggests that Maine's "concerns about privacy and intimidation cannot be taken seriously" because Maine also requires robust public disclosure of campaign contributions. PILF Br. at 55. That the Maine Legislature gave a different weight to privacy concerns in the context of campaign contributions—where few contest the need for robust public disclosure to avoid *quid pro quo* corruption and the appearance thereof—is neither surprising, nor a basis for concluding that the Legislature, when it limited use and dissemination of the Voter File years before the current dispute, *see* P.L. 2005, ch. 404, was not acting out of a good-faith concern for protecting voter privacy.

PILF alleges that there is no evidence that indiscriminate publication of voters' private data will deter voter registration. PILF Br. at 54. Courts, however, have recognized that disclosure of voter personal information may have effects on voter registration and participation. *Fusaro v. Howard*, 19 F.4th 357, 369 (4th Cir. 2021);

*True the Vote*, 43 F. Supp. 3d at 739.  Moreover, PILF's argument that the high voter registration numbers in Maine shows that there is no reason to fear such a deterrent effect makes little sense.  Maine has strictly protected the voter data in its CVR system since CVR's inception, allowing its use only for narrow purposes.  *See* P.L. 2005, ch. 404.  Until now, Maine voters have always had assurance that their personal data maintained in the CVR system would be protected.

Finally, *amicus* United States, while agreeing with the Secretary that states may properly impose some limitations on the use and disclosure of voter personal information without posing an obstacle to congressional intent, USA Br. at 27–30, nevertheless argues that the Publication Ban, as interpreted by the lower court, is "partially" preempted.  *Id.* at 27.  But the hypothetical suggested by the United States in which it claims the Publication Ban would be preempted— creation of a website to allow voters to determine if the state has marked them "inactive," *id.* at 26—is not the sort of activity at issue in this case.[6]  *See* A211 (¶¶ 5–37).  PILF was clear in briefing below that it

---

[6]     The United States also suggests that Exception J may outlaw using Voter File data for voter registration activities.  USA Br. at 20,

asserted only an as-applied challenge to the statute.  *See* Add. at 11

n.16 (concluding PILF waived any facial challenge to Exception J).  The

United States fails to adequately explain why alleged preemption of the

Publication Ban should extend specifically to *PILF's* proposed and likely

activities.

## III.   The district court erred by granting relief relating to Exception J's other restrictions on use of the Voter File.

The Secretary demonstrated that the District Court incorrectly

accepted PILF's maximalist interpretation of the remainder of

Exception J's restrictions.  Sec'y Br. at 57–64.  Because Exception J is

narrower than PILF contends and because, in any event, the Secretary

and the Attorney General have disclaimed any intent to enforce these

aspects of Exception J in the manner PILF claims to fear, the Court

should conclude PILF lacks standing to pursue this aspect of its claim.

---

26.  But state law allows use of the Voter File by "[a] political party, or
an individual or organization engaged in so-called 'get out the vote'
efforts directly related to a campaign."  21-A M.R.S.A. § 196-A(1)(B).
The Secretary interprets "get out the vote" efforts to encompass
encouraging or assisting with voter registration.  And, again, there is no
indication in the record that PILF wishes to engage in those activities.

PILF continues to press its overbroad reading of Exception J's remaining restrictions, contending that Exception J bars it from using the Voter File for analysis or enforcement in other states.[7]  PILF Br. at 56.  PILF focuses on Exception J's use of the phrase "the State's compliance" as opposed to "a state's compliance," arguing that this language does not permit cross-state activities of any sort that make use of the Voter File.  *Id.*

The statute's language could be clearer on this point.  But the flaw with PILF's interpretation, like the district court's, is that it reads the statutory language in a vacuum, without adequately considering legislative purpose.  In Maine courts, "the goal of statutory interpretation is to give effect to the Legislature's intent." *Manirakiza v. Dep't of Health & Hum. Servs.*, 2018 ME 10, ¶ 8, 177 A.3d 1264.  It is not plausible that the Maine Legislature, in creating a statutory exception to confidentially that specifically mentions the NVRA—a federal statute that applies nationally—had an intent to restrict a

---

[7]    PILF appears to have dropped its argument, rejected by the lower court, that Exception J also forbids in-state enforcement actions using the Voter File.  *See* Add. 13 n.18.

requestor's activities involving the Voter File to Maine.  There would be no point to such a restriction.  It would not further Exception J's core purpose of preventing exploitative or other harmful uses of the data.  Thus, to take into account that legislative purpose, the Court should interpret "the State's" to refer to the "target" state of the requestor's evaluation or enforcement activities, whether that be Maine or some other state.  Or, alternatively, it should understand cross-state activities as furthering purposes "directly related" to evaluating Maine's list.  *See* Sec'y Br. at 61.

PILF also argues that the Court should disregard the unequivocal sworn statements of the Deputy Secretary of State in charge of administering Exception J—made with the review and approval of the Secretary herself—as well as the statements of the Attorney General in briefing to the lower court and this Court that neither Office plans to enforce Exception J in the manner PILF claims to fear.  PILF Br. at 60.  Citing no caselaw, PILF argues that these assurances should be rejected because the sworn statement did not come directly from the Secretary herself and the Attorney General's statement was in briefing and thus not sworn.  PILF Br. at 60.  But as the Secretary pointed out,

this Court has accepted assurances in similar form in the past.  *See Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 66 (1st Cir. 2011).  On a more practical level, the notion that the Secretary, after approving the interpretation offered here, would ask the Attorney General to take enforcement action contrary to that interpretation, and that the Attorney General, having made multiple representations to the federal courts to the contrary, would adopt that flawed interpretation to prosecute PILF for engaging in cross-state list analysis is completely implausible.

Because PILF is not at "substantial risk" of prosecution for cross-state use of the Voter File, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), the Court should conclude PILF lacks standing to challenge this aspect of Exception J.

The United States, for its part, suggests that questions concerning the proper interpretation of Exception J should be certified to the Maine Supreme Judicial Court.  USA Br. at 18–21.  While the Secretary does not dispute that the statute is ambiguous regarding cross-state activities, the Secretary's reasonable interpretation of an ambiguous statute is entitled to deference in Maine courts.  *See Arsenault v. Sec'y*

31

*of State*, 2006 ME 111, ¶ 11, 905 A.2d 285.  The United States agrees that the Secretary's interpretation of Exception J is "plausible."  USA Br. at 19.  Certification is therefore unnecessary given the likelihood that the Maine Supreme Judicial Court would defer to the Secretary's interpretation.  However, should this Court disagree, the Secretary would not object to certification as proposed by the United States.

## Conclusion

For the foregoing reasons, the order of the District Court granting summary judgment to PILF should be reversed and the case remanded with instructions to enter summary judgment for the Secretary.

DATED:  August 9, 2023

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
_____
JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Secretary of State
Shenna Bellows*

33

## Certificate of Compliance with Rule 32(a)

1.     This brief contains 6,440 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

 /s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendant-Appellant*
*Shenna Bellows*

## Certificate of Service Form
## for Electronic Filing

I hereby certify that on August 9, 2023, I electronically filed the

foregoing document with the United States Court of Appeals for the

First Circuit by using the CM/ECF system. I certify that the following

parties or their counsel of record are registered as ECF Filers and that

they will be served by the CM/ECF system:

>Noel H. Johnson, Esq.
>Kaylan L. Phillips, Esq.
>Public Interest Legal Foundation, Inc.
>
>Stephen C. Whiting, Esq.
>The Whiting Law Firm

>/s/ Jonathan R. Bolton
>_____
>JONATHAN R. BOLTON
>Assistant Attorney General
>6 State House Station
>Augusta, Maine  04333-0006
>Tel.  (207) 626-8800
>Fax (207) 626-8518
>jonathan.bolton@maine.gov